1996–NMSC–067

930 P.2d 783

**David RHEIN and Timothy Michaels,
Plaintiff–Appellants,**

v.

**ADT AUTOMOTIVE, INC., d/b/a,
Albuquerque Auto Auction,
Defendant–Appellee.**

No. 23285.

Supreme Court of New Mexico.

Nov. 26, 1996.

Roehl Law Firm, P.C., Mark E. Komer, Albuquerque, for Plaintiffs–Appellants.

Law Office of Peter H. Johnstone, P.C., Peter H. Johnstone, Albuquerque, for Defendant–Appellee.

## OPINION

RANSOM, Justice.

1. This is a retaliatory discharge suit against ADT Automotive, Inc. David Rhein claimed that he was terminated because he alerted the New Mexico Department of Occupational Health & Safety (OSHA) about respiratory safety violations at ADT's paint and body shop, and Timothy Michaels claimed that he was terminated because he was about to file a workers' compensation claim for injuries resulting from these safety violations.[1] At trial, the jury returned verdicts for compensatory damages of $235,000 for Rhein and $75,000 for Michaels. The court had refused to instruct on punitive damages. In post-trial proceedings, the court granted ADT's motion for new trial against Rhein,

---

1. The trial court originally dismissed Michaels' complaint for failure to state a claim on the basis that workers' compensation is the exclusive remedy. Michaels appealed this decision, and the appeal was certified to this Court. In *Michaels v. Anglo American Auto Auctions*, 117 N.M. 91, 869 P.2d 279 (1994), we held that Michaels could pursue an action for retaliatory discharge independently of the Workers' Compensation Act. We remanded the case to the trial court for a trial on the merits. *Id.* at 94, 869 P.2d at 282. It also should be noted that Plaintiffs had originally filed suit against Anglo American Auto Auctions, Inc., which was doing business as the Albuquerque Auto Auction, but they substituted ADT when it purchased Anglo American.

and ADT's motion for judgment notwithstanding the verdict against Michaels. The trial court denied Plaintiffs' motion for a new trial on the issue of punitive damages.

2. Rhein and Michaels appealed to the Court of Appeals, which, in turn, certified the case to this Court pursuant to NMSA 1978, § 34–5–14(C)(2) (Repl.Pamp.1990), noting an issue of "substantial public interest" relating to the appealability of an order for new trial when a final order has been entered with respect to another party. On certification from the Court of Appeals we decide the entire case in which the appeal is taken. *Collins v. Tabet,* 111 N.M. 391, 404 n. 10, 806 P.2d 40, 53 n. 10 (1991). We hold that the grant of a new trial is not appealable except when this Court issues a writ of superintending control under circumstances calling for extraordinary relief. We also hold that the trial court erred in refusing to instruct on punitive damages and in granting the motions for new trial and for a judgment notwithstanding the verdict.

3. *Facts and proceedings.* ADT operates a large automotive reconditioning facility. Almost 30,000 cars annually pass through the Albuquerque facility, the majority of these vehicles being "program" cars that automotive manufacturers had previously leased to rental car companies. At the end of the lease term, these cars are brought to ADT by rail and, after reconditioning, are sold in auctions to retail dealers. A second shift at the body shop was created to meet increased business demands. Rhein was hired in late 1990 to work as a body man to prepare collision damaged vehicles for repainting. Michaels was hired several months later as an automotive painter. Both men were hired to work on the second shift, and both remained on this shift for the entirety of their employment at ADT. The evidence supports the following facts and inferences relevant to this appeal.

4. The ADT facility had two painting booths equipped with ventilation systems necessary to keep dangerous toxic "overspray" out of the body shop. Due to a backlog of vehicles, however, ADT management instructed employees to apply paint outside of these controlled areas. The resulting fog from these operations was often so thick that "you could not see across the room" and fresh air respirators were required to protect against the toxins. ADT did provide charcoal mask respirators, but these are not suitable to prevent exposure to the automotive paints being used.

5. Michaels alerted ADT to the health and safety risks posed by the overspray, as well as other safety violations. ADT failed to act on these complaints. Soon afterward, both Rhein and Michaels began to suffer from health problems allegedly related to exposure to airborne toxins. Rhein began to suffer upper respiratory problems and skin rashes, and believed that he was developing both liver problems and toxic hepatitis as a result of his exposure. Michaels' reaction to the toxins was even more severe. He began to lose his hair, run high fevers, and developed a kidney condition. After working his twelve hour shift his face would swell and his skin would crack and bleed.

6. Rhein also took several steps to bring these health and safety problems to the attention of ADT. He met with the personnel director and explained his concerns. He also showed the director a note from his physician regarding toxic hepatitis. The personnel director took Rhein to the general manager, Ken Osborn. Rhein explained his concerns again to Osborn, but Osborn apparently did not seem interested. Later that day Rhein telephoned the New Mexico office of OSHA. Rhein spoke to an OSHA representative about the health risks posed by the current operation of the body shop, and he then mailed in a written complaint. OSHA records indicate that the complaint against ADT was initiated on February 18, 1992.

7. A site inspection of the repair shop was made by OSHA on March 9, 1992. Both Danny Valdez, the reconditioning department manager prior to May 18, 1992, and Les Newman, who was the body shop manager until he replaced Valdez as department manager after May 18, may have seen Rhein's name on a written complaint in the briefcase of the OSHA inspector. ADT, however, denies having any knowledge of which employee had filed the complaint with OSHA. Rhein nonetheless began receiving threats of

termination almost immediately after the OSHA inspection. Newman told Rhein on several occasions that upper management wanted him "out of there," and that Rhein should "keep [his] mouth shut and just do [his] work." Also, Valdez accused Rhein of stealing tools from ADT, an offense that would warrant termination.

8. OSHA returned to ADT on May 5, 1992, and issued several health and safety citations. In response, ADT proposed several new policies for the body shop. One of the policy changes was to prohibit the spraying of paint or primer in the body shop, limiting spraying to the controlled spray booths. This policy was not only unenforced, but management quickly ordered the body shop employees to spray paint and primer in the body shop to keep up with the workload. Another proposed policy change was an order that all body shop employees take a physical examination by a physician. All employees that failed this examination were to be terminated by ADT. Michaels believed that through this policy he was being singled out for termination. He contacted OSHA about the apparent retaliation against him for his health problems. Rhein also called OSHA to report his fears of retaliatory termination.

9. Rhein and Michaels both were terminated on May 18, 1992. Witnesses for ADT testified that both men were laid off because the second shift of the body shop was being phased out, either through lay-offs or attrition. ADT was experiencing a downturn in business, and this eliminated the need of the second shift. ADT contends that the decision to eliminate the second shift was made at a management meeting on May 18, and the employees were then informed at a general employee meeting later in the morning. Rhein testified to the contrary that Newman told him that he was being laid off because he had gone back to school, because he had refused to do "priming work," and because of his health problems. Michaels was not present for the employee meeting, but arrived later in the day with a note from his physician recommending that he avoid work in the body shop for a period of thirty days. Newman informed Michaels that he had been laid off and recommended that he file for unemployment instead of workers' compensation. Michaels insisted on filing for workers' compensation, and the personnel director assisted him with the paperwork for this claim.

10. It is the policy of ADT to rehire laid-off employees when positions become available. Michaels never was contacted by ADT even though positions became available. ADT contended that this is because they had received medical reports indicating that Michaels could not return to a work environment where he was exposed to automotive paint. Rhein was offered a position by ADT as a "color sander buffer" approximately six months after he was laid off. Rhein refused this position because it offered less pay and prestige than his former position. The position that Rhein had held, that of a body man, did open up a few weeks after this, and the position was filled by the employee that had accepted the position as color sander buffer.

11. At the end of the five-day trial, plaintiffs submitted a jury instruction for punitive damages. The trial court refused to give this instruction, and instructed on compensatory damages alone. After deliberating for eight hours the jury returned their compensatory damages verdicts of $235,000 for Rhein and of $75,000 for Michaels. The court heard several post-trial motions and granted ADT judgment notwithstanding the verdict against Michaels and a new trial against Rhein. The court denied Plaintiffs' motion for a new trial based on failure to instruct the jury on punitive damages. In a written decision, the court explained in detail its reasons for granting or denying the motions. Michaels appealed this decision. Rhein was aware that Rule 12–201(D) NMRA 1996 prohibits the immediate appeal of an order granting a new trial, and he filed a petition before this Court for a writ of superintending control allowing an immediate appeal to the Court of Appeals. We granted this extraordinary relief because the issues in Rhein's case "are similar and mutually involved with those of the Michaels appeal." Plaintiffs' appeals were consolidated, and the Court of Appeals then certified the appeal to this Court.

12. *The new trial.—Immediate appealability.* In light of our writ of superin-

tending control, the Court of Appeals certified this case to our Court to address whether an order granting a motion for a new trial is immediately appealable when a final order has been entered with respect to a coparty. In *Scott v. J.C. Penney Co.*, we stated that when a "motion for a new trial is granted, it merely means the case stands as never tried, and until retried and a judgment entered, there is no final judgment." 67 N.M. 219, 220, 354 P.2d 147, 149 (1960). Since only final judgments are appealable, "an order granting a new trial following a jury verdict but before entry of judgment on the verdict is not appealable." *Warren v. Zimmerman*, 82 N.M. 583, 583–84, 484 P.2d 1293, 1293–94 (Ct.App.), *cert. denied*, 82 N.M. 562, 484 P.2d 1272 (1971).

> A motion for new trial that is timely and properly made suspends the finality of the judgment and tolls the running of the time for taking an appeal. If the motion is denied, the full time for appeal commences to run anew from the date of the entry of the order denying the motion. If the motion is granted, or if the court orders a new trial on its own initiative, the finality of the judgment is destroyed and an appeal may not be taken until the entry of a final judgment following the new trial.

6A Jeremy C. Moore et al., *Moore's Federal Practice*, ¶ 59.15[1] (2d ed. 1985). This common-law concept was then codified into our Rules of Appellate Procedure with a 1991 amendment to Rule 12–201(D) NMRA 1996, which states that "[a]n order granting a motion for new trial in civil cases is not appealable and renders any prior judgment nonappealable."

13. We recognize that some jurisdictions have permitted the immediate appeal of an order granting a new trial. *See, e.g., Franklin v. Gupta*, 81 Md.App. 345, 567 A.2d 524, 533 (1990) (stating that the more recent view is that the grant of a new trial is immediately appealable on an abuse of discretion standard). Such appeals also have been approved in other jurisdictions through rules of appellate procedure contrary to those in New Mexico. *See, e.g., Wells v. Tanner Bros. Contracting Co.*, 103 Ariz. 217, 220, 439 P.2d 489, 492 (1968) ("It is quite clear that under this [statutory] provision an order granting a new trial is substantively an appealable order."); *Smallwood v. Dick*, 114 Idaho 860, 863, 761 P.2d 1212, 1215 (1988) (holding that the rules of appellate procedure gave the party "the right to appeal the trial court's order granting a new trial"); *Carlson v. Locatelli*, 109 Nev. 257, 849 P.2d 313, 315 (1993) (holding that the court could hear the appeal "[s]ince an order granting or refusing a new trial is appealable" by statute).

14. New Mexico nonetheless is not alone in holding that the grant of a new civil trial is not immediately appealable. *See, e.g., Nelson v. Hammon*, 802 P.2d 452, 458 (Colo. 1990) (stating that "the trial court's order granting a new trial is not an appealable order" under Rule 59 of the Colorado Rules of Civil Procedure); *Louisiana Nat'l Bank v. Laborde*, 527 So.2d 41, 44 (La.Ct.App.1988) ("A judgment granting a new trial is an interlocutory judgment, not a final one, and it does not cause irreparable injury; hence, it is not an appealable judgment."); *Lamberti v. Tschoepe*, 776 S.W.2d 651, 652 (Tex.Ct. App.1989) ("An order granting a new trial is not subject to review either by direct appeal from that order, or from a final judgment rendered after further proceedings in the trial court.").

■ 15. —*The granting of the writ of superintending control.* While we believe the proper rule in New Mexico is that an order granting a motion for new trial is not immediately appealable as a matter of right, we can grant an appeal under extraordinary circumstances by writ of superintending control. Rhein petitioned this Court for just such a writ because he recognized there indeed was no right of immediate direct appeal from the order. We granted the writ and directed Rhein to file a notice of appeal with the Court of Appeals.

16. The New Mexico Constitution empowers the Supreme Court with superintending control over all inferior courts. N.M. Const. art. VI, § 3. The exercise of this power "is the power to control the course of ordinary litigation in inferior courts." *State v. Roy*, 40 N.M. 397, 421, 60 P.2d 646, 661 (1936). "We exercise this authority by promulgating rules that regulate pleading, prac-

tice, and procedure, by issuing opinions or decisions, by issuing administrative orders, and by issuing extraordinary writs." *District Court of Second Judicial Dist. v. McKenna*, 118 N.M. 402, 405, 881 P.2d 1387, 1390 (1994) (citations omitted). In *State ex rel. Transcontinental Bus Service. Inc. v. Carmody*, we stated that the Supreme Court "may intervene by an appropriate writ in an exercise of its power of superintending control, if the remedy by appeal seems wholly inadequate ... or where otherwise necessary to prevent irreparable mischief, great, extraordinary, or exceptional hardship; costly delays and unusual burdens of expense." 53 N.M. 367, 378, 208 P.2d 1073, 1080 (1949).

17. In this case, we granted our writ of superintending control because we believed that to do otherwise would amount to a denial of justice. Rhein and Michaels are co-plaintiffs in this action, and both wished to appeal from the decision of the trial court. Michaels is able to appeal his case to the Court of Appeals as a matter of right because his case was dismissed under a judgment notwithstanding the verdict. As we noted in the writ,

> Whereas, it appearing that the issues that petitioner seeks to appeal from the grant of a new trial are similar and mutually involved with those of Michaels' appeal, the two cases having been tried jointly, and there appearing to be mixed questions of law and discretion in the grant of the new trial, this Court deems extraordinary relief to be warranted to serve the purpose of fairness and judicial economy.

For these reasons, we determined that Rhein should be granted the *extraordinary* relief of an immediate appeal.

18. —*The trial court abused its discretion in granting a new trial.* We acknowledge that the "trial court has broad discretion in granting or denying a motion for new trial, and such an order will not be reversed

absent clear and manifest abuse of that discretion." *State v. Chavez*, 98 N.M. 682, 684, 652 P.2d 232, 234 (1982). We apply this abuse-of-discretion standard "[b]ecause the trial judge has observed the demeanor of the witnesses and has heard all the evidence ... [and thus] the function of passing on motions for new trial belongs naturally and peculiarly to the trial court." *State v. Smith*, 104 N.M. 329, 333, 721 P.2d 397, 401 (1986). This does not mean that the trial court has an unrestricted ability to grant a motion for a new trial. It is proper for the trial court to grant a motion for a new trial in a civil case only when certain conditions are met.

19. The trial court here set out several reasons for granting the motion for a new trial. First, the court stated that the verdict in favor of Rhein, and the amount of damages awarded, was "contrary to the great weight of the evidence." Second, the court found that the jury's award to Rhein of over three times the damages that Michaels received was inconsistent with the evidence presented, which tended to show that Michaels would be entitled to twice the damages of Rhein. Third, Plaintiffs' counsel made several remarks during closing arguments which prejudiced the jury against ADT. Plaintiffs assert that each of these three findings was made in error.

20. Rhein asserts that there was sufficient evidence in his case to support the jury's verdict. Rhein had contacted several members of ADT's management and informed them of the dangers posed by health and safety violations. Rhein alleges that at least two managers discovered that he had informed OSHA of these problems, and they held him responsible for the two visits from OSHA.[2] He was threatened immediately after the first visit, and he was terminated less than two weeks after OSHA returned and cited ADT for these violations. He contacted OSHA one week before his termination and

---

2. In its answer brief, ADT asserts that the OSHA violations were not relevant to the retaliatory discharge claims. The trial court apparently agreed with ADT, noting in its decision letter that "[i]n argument, it was never pointed out how such asserted facts supported the claim of retaliatory discharge or the amount of damages. Much of the evidence went only to the violations

of OSHA regulations. Most of the above had no or very little relevance to retaliatory discharge." The Plaintiffs' theory of the case, however, was that ADT had terminated Rhein because he had alerted OSHA to health and safety violations. We cannot agree with the trial court that evidence of OSHA violations is irrelevant to Plaintiffs' claim of retaliatory discharge.

informed them of his fears of retaliatory termination. Also, Rhein presented evidence at trial that he was earning $35,000 at ADT and was forced to take employment at half that salary after his termination. Rhein argues that all of this evidence supports the jury's verdict.

21. Rhein further argues that the disparity in damages shows that the jury considered the case in detail. At trial, ADT asserted the defense of failure to mitigate damages against Michaels. Michaels had worked as an automotive painter at ADT, but had failed to return to auto painting after his termination. He had instead chosen to become self-employed at a fraction of his previous wages. Additionally, ADT informed the jury that Michaels was receiving workers' compensation for his injuries. Rhein argues that the jury may have reduced Michaels' recovery because he was already being compensated for injuries attributable to ADT.

22. Finally, Rhein asserts that comments made during closing were proper and did not prejudice the jury. During closing, Plaintiffs presented the jury with several inferences to be drawn by the jury, including, for example, that Danny Valdez was acting as a pawn for ADT management, and that Valdez had attempted to "set up" Rhein by accusing him of stealing tools. The comments were proper attempts to "reconcile the conflicting evidence." Furthermore, there were no objections made by opposing counsel, nor admonitions by the court, on the issues of prejudice relied upon by the trial court in its decision letter.

23. It is readily apparent that the trial court in this case came to different conclusions than the jury. The court determined that the jury's verdict was inconsistent with the evidence and the credibility of the witnesses. Without more, however, it is improper for the trial court to grant a new trial. A trial court can grant a motion for new trial only when there is evidence of jury tampering or other contamination of the process, e.g., Martinez v. Ponderosa Prods. Inc., 108 N.M. 385, 772 P.2d 1308 (Ct.App.1988), cert. denied, 108 N.M. 273, 771 P.2d 981 (1989) (holding that it was proper for the trial court to grant a motion for a new trial when one of the parties had approached a prospective juror and sought a favorable verdict), or when the weight of the evidence is clearly and palpably contrary to the jury's verdict, Ruhe v. Abren, 1 N.M. 247, 250 (1857) ("The weight of the evidence must be clearly and palpably contrary to the verdict, and a new trial will only be granted where it is manifest to a reasonable certainty that justice has not been done.").

24. A court can never grant a new trial merely because it doubted the credibility of the witnesses. The jury must be the exclusive evaluator of the evidence and the credibility of witnesses, with the trial court only intervening when the jury's verdict is so against the weight of evidence that it would be a grave injustice to allow the verdict to stand.[3] A review of the evidence set forth in detail above reveals that the jury's verdict was not "clearly and palpably contrary" to the weight of the evidence, and that the trial court abused its discretion by granting the motion for a new trial. Therefore, we reverse the trial court on this issue.

25. *Judgment notwithstanding the verdict.* Michaels argues that the trial court erred in granting ADT's motion for judgment notwithstanding the verdict.[4]

---

3. In *Townsend v. United States Rubber Co.,* we held that a court could not grant a motion for a judgment n.o.v. based upon the evidence or credibility of the witnesses, and that it "had no alternative but to grant a new trial rather than the motion for judgment notwithstanding the verdict." 74 N.M. 206, 210, 392 P.2d 404, 407 (1964). For the reasons mentioned above, we now believe that it is improper for the trial court to grant a motion for a new trial in this situation. Any language from *Townsend* that is inconsistent with this opinion is hereby overruled.

4. We recognize that, while a trial court must already have denied a directed verdict, e.g., *Bondanza v. Matteucci,* 59 N.M. 354, 356, 284 P.2d 1024, 1025 (1955) (stating that "we think it beyond question that a motion for a directed verdict at the close of all the evidence is a prerequisite to a motion for judgment notwithstanding verdict"), trial courts otherwise disposed to direct a verdict often allow a case to go to the jury as a matter of judicial economy. If the court grants a motion for directed verdict and that directed verdict is reversed by an appellate court, there must be an entirely new trial. *See Tafoya*

When considering a motion for judgment notwithstanding the verdict, "this Court has always considered the testimony in a light most favorable to the prevailing party." *Adams v. United Steelworkers of Am.*, 97 N.M. 369, 372, 640 P.2d 475, 478 (1982) (citing *Montoya v. General Motors Corp.*, 88 N.M. 583, 544 P.2d 723 (Ct.App.1975), *cert. denied*, 89 N.M. 5, 546 P.2d 70 (1976), *and cert. denied, Montoya v. Mountain States Tel. & Telegraph Co.*, 90 N.M. 8, 558 P.2d 620 (1976)). "In testing the propriety of a judgment notwithstanding the verdict, the evidence favorable to the successful party, together with all inferences as may be reasonably drawn therefrom, will be accepted as true and all evidence to the contrary will be disregarded." *Scott v. McWood Corp.*, 82 N.M. 776, 777, 487 P.2d 478, 479 (1971). Upon analysis, we "should be able to say that there is neither evidence nor inference from which the jury could have arrived at its verdict." *Townsend*, 74 N.M. at 209, 392 P.2d at 407 (citing *Michelson v. House*, 54 N.M. 197, 218 P.2d 861 (1950)).

■ 26. The evidence favoring the verdict includes testimony that Michaels had been suffering from continued health problems which had noticeable physical manifestations. He had been seeing a physician about his health problems, and had informed his supervisor that his sickness was likely related to exposure to toxins in the work place. On May 15, 1992, the Friday before his termination, Michaels had another strong reaction to the paint fumes and his physician placed him on a thirty-day work restriction. Michaels called his supervisor, Valdez, and informed him that he would come to work on Monday with the letter from his doctor. When he returned to work with the note he discovered that he had been terminated. Because ADT was aware of Michaels' work-related health problems and Valdez had been informed that Michaels would be unable to work in the body shop for thirty days, it can be inferred that ADT knew that Michaels would be filing a worker's compensation claim on May 18, and they choose to terminate him and attempt to persuade him to file for unemployment instead of workers' compensation.

27. ADT asserts that Valdez was not informed that Michaels would be bringing in a note from his physician. Further, Valdez was replaced as supervisor on Monday morning, and the decision to eliminate the second shift was made on that morning by upper management. ADT asserts that no one with the power to terminate Michaels was aware of his intention to file a worker's compensation claim. He was simply a member of the second shift, a shift that had to be eliminated because of reduced business. The trial court apparently agreed with ADT. The court stated that

> The evidence is undisputed that (1) there were other workers' compensation cases and no one was fired relative to them; (2) Mr. Michaels was to be terminated when he arrived at work on May 18, 1992; (3) After Mr. Michaels arrived at work and informed defendant of his medical condition, defendant's employees initiated the filing of the compensation claim and helped Mr. Michaels with the paper work to get the claim filed, all *after he was to be terminated.* The facts as asserted by Plaintiffs' counsel in closing argument and in various briefs to support the jury verdict are either inaccurate, partial statements, statements out of context, or facts which equally support several hypotheses and, therefore, prove nothing.

28. The evaluation of competing theories, whether they *equally* support several hypotheses, is a proper determination for the jury, not the judge. A jury could have determined that Michaels simply was the victim of corporate downsizing, or it could have deter-

---

*v. Seay Bros. Corp.*, 119 N.M. 350, 353, 890 P.2d 803, 806 (1995) (remanding for new trial after reversing order granting directed verdict); *Flores v. Baca*, 117 N.M. 306, 314, 871 P.2d 962, 970 (1994) (same); *Davis v. Gabriel*, 111 N.M. 289, 292, 804 P.2d 1108, 1111 (Ct.App.1990) (same). However, if the court grants a motion for j.n.o.v. and it is reversed, the jury verdict is then merely reinstated. *See Leonard Motor Co. v. Roberts Corp.*, 85 N.M. 320, 323, 512 P.2d 80, 83 (1973) (reinstating jury verdict after reversing order granting judgment notwithstanding verdict); *Montoya v. General Motors Corp.*, 88 N.M. 583, 587, 544 P.2d 723, 727 (Ct.App.1975) (same), *cert. denied*, 89 N.M. 5, 546 P.2d 70 (1976).

mined that ADT intentionally terminated an employee that it viewed as a troublemaker and a potential liability. The existence of several hypotheses is not a proper standard for granting a motion for judgment notwithstanding the verdict. ADT would have had to show that there was *"neither evidence nor inference* from which the jury could have arrived at its verdict." *Townsend,* 74 N.M. at 209, 392 P.2d at 407. In this case there was evidence that ADT knew Michaels would likely be filing for worker's compensation, and it is reasonable for the jury to have inferred that ADT chose to terminate Michaels in anticipation of this claim.

29. Additionally, we believe the three contrary inferences drawn by the trial court to be in error. First, we cannot infer that Michaels was not the victim of retaliatory discharge merely because other employees had filed worker's compensation claims and had not been terminated. Michaels' health problems apparently were related directly to unsafe conditions at ADT, conditions that were in violation of OSHA. Unless it can be shown that the other employees who had filed worker's compensation claims were also victims of similarly unsafe conditions, all inferences comparing these instances are questionable. Second, the fact that an ill employee was to be terminated on the day that he showed up with a doctor's note recommending avoidance of work for an extended period, a letter of which ADT was aware, is not merely coincidental. Third, we cannot infer that ADT did not commit retaliatory discharge merely because they assisted Michaels in filing for worker's compensation. Newman had attempted to talk Michaels out of filing for worker's compensation, and when ADT did assist Michaels, they were merely complying with a legal obligation, *see* NMSA 1978, § 52–1–58 (Repl.Pamp.1991). We therefore reverse the trial court and hold that judgment notwithstanding the verdict was improperly granted.

■ 30. *Punitive damages.* Plaintiffs are correct in their assertion that punitive damages are allowable in all retaliatory discharge cases. The tort of retaliatory discharge is an intentional tort, *Chavez v. Manville Products Corp.,* 108 N.M. 643, 649, 777

P.2d 371, 377 (1989), and as our Court of Appeals has previously noted, "Without punitive damages there may be little to discourage an employer from discharging an employee if the pecuniary losses are insignificant. Further, the threat of a petty misdemeanor ... might in some instances provide insufficient deterrence to retaliatory discharge. The ability to recover punitive damages should offer a sufficient deterrent." *Vigil v. Arzola,* 102 N.M. 682, 690, 699 P.2d 613, 621 (Ct.App.1983), *overruled on other grounds, Chavez v. Manville Products Corp.,* 108 N.M. 643, 647, 777 P.2d 371, 375 (1989). "The purpose of punitive damages is to punish the wrongdoer and to deter the wrongdoer and others in a similar position from such misconduct in the future." *Conant v. Rodriguez,* 113 N.M. 513, 517, 828 P.2d 425, 429 (Ct.App.1992).

■ 31. "It is a well-established rule in New Mexico that a principal may be held liable for punitive damages when the principal has in some way authorized, ratified, or participated in the wanton, oppressive, malicious, fraudulent, or criminal acts of its agent." *Albuquerque Concrete Coring Co. v. Pan Am World Servs., Inc.,* 118 N.M. 140, 143, 879 P.2d 772, 775 (1994) (citing *Samedan Oil Corp. v. Neeld,* 91 N.M. 599, 601, 577 P.2d 1245, 1247 (1978)). According to the Restatement, "[p]unitive damages can properly be awarded against a master or other principal because of an act by an agent if ... the agent was employed in a managerial capacity and was acting in the scope of employment." Restatement (Second) of Agency § 217C(c) (1957). We adopted the Restatement standard in *Albuquerque Concrete,* noting that "[w]hen a corporate agent with managerial capacity acts on behalf of the corporation, pursuant to the theoretical underpinnings of the Restatement rule of managerial capacity, his acts are the acts of the corporation; the corporation has participated." *Albuquerque Concrete,* 118 N.M. at 146, 879 P.2d at 778. A managerial employee has been defined "as one who 'formulates, determines and effectuates his employer's policies, one with discretion or authority to make ultimate determinations independent of company consideration and approval of·

whether a policy should be adopted.' " *Id.* at 145, 879 P.2d at 777 (quoting *Abshire v. Stoller,* 235 Ill.App.3d 849, 176 Ill.Dec. 559, 565, 601 N.E.2d 1257, 1263 (1992), *appeal denied,* 148 Ill.2d 639, 183 Ill.Dec. 15, 610 N.E.2d 1259 (1993)).

32. Plaintiffs allege that every person involved in the decision to terminate them had managerial authority. Valdez, as the manager of the reconditioning department, had the authority to fire both plaintiffs, and there was some testimony presented that he was involved in the terminations. Newman was present at the meeting on May 18, and he also had the same authority as Valdez. Osborn stated in his deposition that he had the "ultimate authority" to hire and fire employees, and that he made the decision to terminate the plaintiffs at the May 18 meeting. ADT disagrees, arguing that neither Valdez nor Newman had authority to fire plaintiffs, that Osborn was the only person with this authority. However, all three men could make ADT liable for punitive damages under the Restatement standard that we adopted in *Albuquerque Concrete,* 118 N.M. at 146, 879 P.2d at 778. They each were employed in managerial capacities with varying degrees of authority, and each acted within the scope of that authority. Therefore, the trial court should have given the instruction on punitive damages.

33. *Conclusion.* An order granting a motion for a new trial in a civil case is not immediately appealable in New Mexico except when this Court has granted a writ of superintending control under circumstances demanding extraordinary relief. In light of the evidence presented, and reasonable inferences drawn from that evidence, we find that the trial court improperly granted the motions for new trial and for judgment notwithstanding the verdict. We therefore reverse the trial court and remand for entry of judgment on the verdicts of the jury. The trial court also erred in refusing to instruct the jury on punitive damages. Plaintiffs are entitled to a new trial on the issue of punitive damages which, if awarded, must be "reasonably related to the injury and to the damages given as compensation and not disproportion-

ate to the circumstances." *See* UJI 13–1827 NMRA 1996 (punitive damages instruction).

34. **IT IS SO ORDERED.**

BACA, C.J., and FRANCHINI, J., concur.

