2002-NMSC-021

49 P.3d 662

Jim AKEN, Plaintiff–Respondent,

v.

PLAINS ELECTRIC GENERATION & TRANSMISSION COOPERATIVE, INC. and Craig Chapman, Defendants–Petitioners.

No. 26,730.

Supreme Court of New Mexico.

June 4, 2002.

Rodey, Dickason, Sloan, Akin & Robb, P.A., Edward Ricco, Albuquerque, NM, for Petitioners.

Foster, Johnson, McDonald, Lucero & Koinis, L.L.P., Thomas L. Johnson, Kerri L. Peck, Kathryn D. Lucero, Albuquerque, NM, for Respondent.

## OPINION

MAES, Justice.

{1} In this punitive damages case, we are asked to assess jury awards in favor of Jim Aken and against Plains Electric on Aken's claims for retaliatory discharge and defamation. We conduct an analysis on procedural and substantive levels and affirm the jury awards.

*FACTS*

{2} On July 28, 1993, Aken had worked for Plains for nine years. He had been selected employee of the month and employee of the year. The evidence was consistent that he was respected and trusted and had a reputation for honesty and integrity. Aken was somewhat unique at Plains in that he tended to stand up to management, particularly on issues of plant safety and sexual harassment in the workplace. When he complained about plant safety, he was told by management that this was "not conducive to long-term employment." When he went to Joanna Simpson, the plant human relations manager, about a female plant employee who had been the victim of sexual harassment,

Simpson stated she did not want to hear from him about it.

{3} Aken paid for his stalwartness. He was given an unsatisfactory attendance mark when he took time off to recover from pneumonia and because of the deaths of his mother and uncle. Despite his competence and leadership qualities, he was consistently denied promotions. In 1992, he had volunteered for service on the plant Policy Review Team, and fellow members of the team stated to management in writing that Aken had been "harassed, humiliated, intimidated and retaliated against" in an effort by management to "coerc[e] ... employees into silence."

{4} During the day of July 28, some unknown person or persons at the plant hid a welding machine from Aken three different times, apparently engaging in "horseplay" typical at the plant. Aken eventually hid the welding machine in a cardboard box in a place where he could have a plant electrician do some work on it the next morning. On July 29, Aken went with the electrician to the place he had put the welder only to discover it was not there. It had been taken by management and hidden in a tool room. Craig Chapman, Aken's immediate supervisor, escorted Aken to a meeting with plant manager Oren Key, supervisor James McCollam, and Simpson, where Aken was to be accused of (and later terminated for) stealing the welder. Chapman knew then that the welder had been placed in the tool room. There was no basis for concluding that Aken had stolen or had attempted to steal a welder; a rational reading of the record strongly suggests that management, who, according to testimony, operated more like a "gang" enforcing closed-mouthedness and mindless toeing of the line on the part of employees, was waiting for an opportunity to terminate Aken, however unfairly.

{5} At the meeting, upon being accused of theft, Aken suffered a stroke. Later, when his wife called Plains asking for an explanation of what had happened, she overheard Key tell Chapman, to whom Aken's wife was talking, that Key would not talk to her and that if Chapman knew "what was good for him, he would keep his mouth shut, too."

Simpson and Superintendent of Operations Don Russell also refused to provide Aken's wife with any explanation.

{6} There is nothing in the record which suggests that the source of information that Aken had been fired for stealing a welder, which was disseminated to plant workers in general, was anyone other than members of management. The jury was instructed that Plains itself was susceptible to a punitive damages award if it "authorized, participated in, or ratified" the illegal acts of its managers or other employees. There was credible evidence that at the hospital Chapman told Aken's fellow worker, Twig Hollar, that Aken had stolen a machine. Chapman specifically told another worker, Robert Gonzales, that Aken had stolen a welder. Mike McInnes, then plant manager, announced at a staff meeting that Aken had been fired for theft. Foreman Alan Bratzell also told Hollar that Aken was fired for stealing a welder. Jim Behnken, a coordinator in management at Plains headquarters in Albuquerque, told an employee that Aken was fired for stealing.

{7} Aken had never been accused of anything such as stealing equipment from the job and was "ashamed." It was difficult for him to deal with people who now thought he was a thief. He had sleepless nights and was depressed.

{8} On August 4, 1993, while still hospitalized, Aken was fired. He sued for wrongful termination (retaliatory discharge) and defamation. After an eight-day trial, the jury entered an award in favor of Aken on his wrongful termination claim ($500,000 compensatory and $1,750,000 punitive damages) and on his defamation claim ($100,000 compensatory and $1,000,000 punitive damages). Plains appealed on numerous grounds to the Court of Appeals, which affirmed the judgment in favor of Aken in a memorandum opinion. On certiorari, Plains now seeks review on the sole ground that the punitive damages awards are "grossly excessive" under the three-guidepost test of *BMW of North America, Inc. v. Gore,* 517 U.S. 559, 574, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996).

*PRELIMINARY ISSUE*

■ {9} There is an issue in this appeal whether the primary issue—the alleged con-stitutional excessiveness of the punitive damages awards—was adequately preserved below. The Court of Appeals refused to decide any issues of the constitutionality of the awards on the ground that the arguments "were not raised below" and were "never voiced at trial." *See Aken v. Plains Elec. Generation & Transmission Corp.,* NMCA No. 20,271, slip op., at 15–16, 25 (Dec. 13, 2000). Both parties agree that the issue was in fact raised at trial, in Plains' motion for reconsideration. What the parties argue in their briefs is whether under Rule 12–213(A)(4) NMRA 2002, Plains' brief in chief in the Court of Appeals complied with the requirement that the brief contain "a statement explaining how the issue was preserved in the court below." The constitutional claim was not specifically referenced to the Court of Appeals, although a complete reading of Plains' brief in that court would have revealed that it was voiced in the trial court. We also note that Aken responded to the argument in his answer brief below.

{10} We have held that we will "construe the rules of appellate procedure liberally so that causes on appeal may be determined on their merits." *Danzer v. Prof'l Insurors, Inc.,* 101 N.M. 178, 180, 679 P.2d 1276, 1278 (1984); *see also Garcia ex rel. Garcia v. La Farge,* 119 N.M. 532, 540, 893 P.2d 428, 436 (1995) (finding due process issue adequately preserved although arguments raising issue "were not a model of clarity"). We conclude that Defendant properly preserved the constitutional issue in the trial court and substantially complied with the requirement that the manner of preservation be set out in its brief-in-chief. The Court of Appeals erred in not considering the argument, and so we will proceed to do so.

*PROCEDURAL VERSUS SUBSTANTIVE DUE PROCESS*

{11} The United States Supreme Court indicated in a series of cases preceding *BMW* that excessive punitive damages awards may constitute a violation of a defendant's substantive due process rights. *See Aetna Life Ins. Co. v. Lavoie,* 475 U.S. 813, 828–29, 106 S.Ct. 1580, 89 L.Ed.2d 823 (1986) (case disposed of on other grounds); *Bankers Life &*

*Cas. Co. v. Crenshaw,* 486 U.S. 71, 76, 108 S.Ct. 1645, 100 L.Ed.2d 62 (1988) (declining to reach issue); *Browning–Ferris Indus. of Vermont v. Kelco Disposal, Inc.,* 492 U.S. 257, 276–77, 109 S.Ct. 2909, 106 L.Ed.2d 219 (1989) (reflecting explicit recognition by Court that Due Process Clause places "some limits" on the size of punitive damages awards); *Pac. Mut. Life Ins. Co. v. Haslip,* 499 U.S. 1, 23, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991) (calling a four to one ratio of punitive to compensatory damages substantively "close to the line"); *TXO Prod. Corp. v. Alliance Res. Corp.,* 509 U.S. 443, 453–54, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993) (plurality opinion) (stating Due Process Clause imposes "substantive limits 'beyond which penalties may not go' ") (quoting *Seaboard Air Line Ry. Co. v. Seegers,* 207 U.S. 73, 78, 28 S.Ct. 28, 52 L.Ed. 108 (1907)).

{12} The review in *Haslip* and *TXO* strongly emphasized the procedural component of the Due Process Clause. The Court in *TXO* stressed the importance of procedural regularity as underpinning any substantive analysis: "Assuming that fair procedures were followed, a judgment that is a product of that process is entitled to a strong presumption of validity. Indeed, there are persuasive reasons for suggesting that the presumption should be irrebuttable or virtually so." *TXO,* 509 U.S. at 457 (plurality opinion) (citation omitted). After these cases, "the door remained open for defendants to argue that their *particular* punitive damages award was 'grossly excessive' and therefore an arbitrary deprivation of property in violation of substantive due process." Neil B. Stekloff, Note, *Raising Five Eyebrows: Substantive Due Process Review of Punitive Damages Awards After BMW v. Gore,* 29 Conn. L.Rev. 1797, 1806 (1997) [hereinafter *Raising Five Eyebrows*]. The Court granted certiorari in *BMW* to "help ... illuminate 'the character of the standard that will identify unconstitutionally excessive awards' of punitive damages." *BMW,* 517 U.S. at 568 (quoting *Honda Motor Co. v. Oberg,* 512 U.S. 415, 420, 114 S.Ct. 2331, 129 L.Ed.2d 336 (1994)). Thus, after concentrating on the procedural aspects of punitive damages awards, the Court undertook to expand the analysis and deal straightforwardly with the end result of the process—the substantive validity of the award.

The uncertainty over exactly how objective standards for the assessment of punitive damages may be drawn from ... [*BMW* ] gives renewed importance to the presumption of validity of the award that arises when fair procedures are followed.... The degree to which the concurring opinion in *BMW* focuses on the importance of following fair procedures seems to suggest their discomfort with reviewing courts setting arbitrary levels that define excessive punitive damage awards.

Douglas G. Harkin, *BMW of North America, Inc. v. Gore: A Trial Judge's Guide to Jury Instructions and Judicial Review of Punitive Damage Awards,* 60 Mont. L.Rev. 367, 384–85 (1999). We determine that in order to afford meaningful review of the substantive aspect of the punitive damages award in this case, we must ascertain that the procedures used to arrive at the award were fair.

## PROCEDURAL DUE PROCESS

{13} The *Haslip* Court established several standards which it said would apply to determining the fairness of an award from a procedural standpoint:

Under the traditional common-law approach, the amount of the punitive award is initially determined by a jury instructed to consider the gravity of the wrong and the need to deter similar wrongful conduct. The jury's determination is then reviewed by trial and appellate courts to ensure that it is reasonable.

... This Court more than once has approved the common law method for assessing punitive awards

*Haslip,* 499 U.S. at 15, 111 S.Ct. 1032. The Court clarified three areas where proper procedures must be in place in order to assure due process has been followed. In upholding the Alabama procedure, the Court found that jury instructions

enlightened the jury as to the punitive damages' nature and purpose, identified the damages as punishment for civil wrongdoing of the kind involved, and ex-

plained that their imposition was not compulsory.

... These instructions, we believe, reasonably accommodated [the defendant's] interest in rational decisionmaking and Alabama's interest in meaningful individualized assessment of appropriate deterrence and retribution.

*Haslip*, 499 U.S. at 19–20, 111 S.Ct. 1032. The jury instructions employed in the instant case meet the standard of *Haslip*. The jury was instructed that it "may" award punitive damages. The jury was further instructed that the purpose of punitive damages is to punish and deter wrongful conduct in cases such as that before the jury, that the jury should act toward the ends of reason and justice, that they were to examine the nature of the wrong and any aggravating or mitigating circumstances, and that punitive damages must relate to actual damages and the injury sustained.

{14} The second area examined by the Court in *Haslip* was post-trial procedure previously established by the Alabama Supreme Court. The trial court was to utilize several factors and "reflect in the record the reasons for interfering with a jury verdict, or refusing to do so, on grounds of excessiveness of the damages." *Haslip*, 499 U.S. at 20, 111 S.Ct. 1032 (quoting *Hammond v. Gadsden*, 493 So.2d 1374, 1379 (Ala.1986)). The point was that this procedure "ensures meaningful and adequate review by the trial court whenever a jury has fixed the punitive damages." *Id.* We will determine the meaningfulness of post-trial trial court review rather than looking at the Alabama procedure considered in *Haslip* as a precise model. *See Glasscock v. Armstrong Cork Co.*, 946 F.2d 1085, 1099 (5th Cir.1991) ("We get no indication from *Haslip* that the Court will scrutinize each state's procedure with Alabama as the precise model."). In *Fraidin v. Weitzman*, 93 Md.App. 168, 611 A.2d 1046, 1067 (Spec.App.1992), the court said, "Even in the wake of *Haslip*, there is no requirement in Maryland that a trial court state on the record its reasons for interfering or not interfering with a jury verdict." This was because the court found no requirement in the state or federal rules that a trial court

specify the grounds on which a motion for a new trial or a remittitur should be granted or denied, and because in some cases it will be clear from the record how the trial court came to its conclusion. *Id.* In *MGW, Inc. v. Fredricks Development Corp.*, 6 Cal.Rptr.2d 888, 895–96 (Ct.App.1992), the court explained why traditional post-trial procedure is adequate in the review of a punitive damages award:

A defendant who is upset by a punitive damages award may have it reviewed in the trial court simply by moving for a new trial ..., hardly a constitutionally onerous task.

... In considering a motion for a new trial, the trial judge is entitled to reweigh the evidence, consider the credibility of the witnesses and draw reasonable inferences contrary to those accepted by the jury. The question is not whether there is substantial evidence to support the jury's verdict but whether the record supports the trial court's determination, after weighing the evidence, [that] the jury should have reached a different verdict.

(citations omitted in original). In *TXO*, 509 U.S. at 464–65, 113 S.Ct. 2711, which followed *Haslip*, the Court was apparently satisfied that at the trial level the court gave counsel an "adequate hearing" on TXO's post-verdict motions, "and during one colloquy indicated his agreement with the jury's appraisal of the egregious character of the conduct of TXO's executives."

■ {15} In the case at bar, Plains had the opportunity to and did in fact file motions for judgment notwithstanding the verdict, for a new trial or remittitur, and for reconsideration. In denying the motions, the trial court did comment that it considered the compensatory and punitive awards "very high" given the evidence of damages, but nonetheless "within bounds" in light of the court's "particular bias in favor of jury verdicts, whatever they are." We conclude that the post-trial review in this case was meaningful according to Supreme Court mandate, based mainly on the availability of the various procedures and the statement of the court indicating it was cognizant of Plains' claims.

{16} Finally, the *Haslip* Court looked at appellate procedure. "By its review of punitive awards, the Alabama Supreme Court provides an additional check on the jury's or trial court's discretion. It first undertakes a comparative analysis. It then applies the detailed substantive standards it has developed for evaluating punitive awards." *Haslip*, 499 U.S. at 20–21, 111 S.Ct. 1032. (citation omitted). *BMW* followed *Haslip* and supplanted it with its more definitive method for appellate courts to employ in reviewing the substantive appropriateness of punitive awards. It is that analysis to which we now turn.

*SUBSTANTIVE DUE PROCESS*

*Standard of Review*

■ {17} In New Mexico, the rule has been that a punitive damages award will be upheld if substantial evidence supports the jury's finding. *See Allsup's Convenience Stores, Inc. v. N. River Ins. Co.*, 1999–NMSC–006, ¶ 48, 127 N.M. 1, 976 P.2d 1; *Econ. Rentals, Inc. v. Garcia*, 112 N.M. 748, 764, 819 P.2d 1306, 1322 (1991); *Green Tree Acceptance, Inc. v. Layton*, 108 N.M. 171, 174, 769 P.2d 84, 87 (1989). Recently, the United States Supreme Court handed down its opinion in *Cooper Industries v. Leatherman Tool Group, Inc.*, 532 U.S. 424, 121 S.Ct. 1678, 149 L.Ed.2d 674 (2001), holding that the federal "courts of appeals should apply a *de novo* standard of review when passing on district courts' determinations of the constitutionality of punitive damages awards." *Id.* at 436, 121 S.Ct. 1678. Whatever the contours of the *Cooper Industries* holding may be when substantively applied, one immediate question is raised by the inexplicitness of the opinion. That is, whether de novo review is constitutionally required or was imposed by the Court in the exercise of its supervisory authority over the federal courts. If the latter, we are not necessarily bound by the holding. *See Smith v. Phillips*, 455 U.S. 209, 221, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982) ("Federal courts hold no supervisory authority over state judicial proceedings and may intervene only to correct wrongs of constitutional dimension.") We conclude that *Cooper Industries* imposed de novo review as a matter of federal constitutional imperative.

{18} The reason for the holding in *Cooper Industries* that a de novo standard of review should apply to a determination of the constitutionality of punitive damages was to allow the concept of "gross excessiveness" of those awards to become better defined legally through appellate pronouncements on the excessiveness of awards in particular cases. Gross excessiveness is like " 'reasonable suspicion' " or " 'probable cause' " which are " 'fluid concepts that take their substantive content from the particular contexts in which the standards are being assessed.' " *Cooper Indus.*, 532 U.S. at 436, 121 S.Ct. 1678 (quoting *Ornelas v. United States*, 517 U.S. 690, 696, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996)). The Court found that gross excessiveness is in turn a legal principle that will acquire an increasingly cogent definition to be articulated by appellate courts, as opposed to there being no real rhyme or reason touching on awards considered reasonable before *Cooper Industries*. " 'Independent review is therefore necessary if appellate courts are to maintain control of, and to clarify, the legal principles.' " *Id.* (quoting *Ornelas*, 517 U.S. at 697, 116 S.Ct. 1657). The Court also noted that de novo review " 'tends to unify precedent.' " *Id.* (quoting *Ornelas*, 517 U.S. at 697, 116 S.Ct. 1657).

■ {19} Thus we will apply de novo review. We note that substantial evidence review is different; there, evidence is viewed in the light most favorable to the prevailing party and all inferences arising from the factual findings of a trial court are indulged in. *See Eagle Laundry v. Fireman's Fund Ins. Co.*, 132 N.M. at 279, 46 P.3d at 1279 (Ct.App. 2002). Under de novo review, we are to make an independent assessment of the record. *See Gabaldon v. Erisa Mortgage Co.*, 1997–NMCA–120, ¶ 6, 124 N.M. 296, 949 P.2d 1193. Furthermore, after most jury trials, there are no findings of fact on which to rely in order to make a separate appellate judgment on punitive damages. We believe the solution to this problem has been articulated by the Supreme Court in the statement that, " ' "We need not, and indeed we cannot, draw a mathematical bright line between the constitutionally acceptable and the constitutionally unacceptable that would fit every

case. We can say, however, that [a] general concern of reasonableness ... properly enter[s] into the constitutional calculus." ' " *BMW*, 517 U.S. at 582–83, 116 S.Ct. 1589 (quoting *TXO*, 509 U.S. at 458, 113 S.Ct. 2711 (quoting *Haslip*, 499 U.S. at 18, 111 S.Ct. 1032)) (alteration and omission in *TXO* ). This statement suggests to us that the proper standard of review is as follows: that an appellate court must read the record before it bearing in mind, with respect to each relevant factor announced in *BMW* (discussed in detail below), whether the jury's award of punitive damages is comparatively reasonable. Anytime the record clearly shows that the jury should not have concluded as it did, the appellate court may, exercising its de novo power, set aside the award. An appellate court is thus confronted with a grave responsibility—armed with the power to strike down an award on a de novo basis, the court must actually conduct an analysis of the reasonableness of the jury verdict. Any doubt in the mind of the appellate court concerning the question of what appropriate damages may be in the abstract, or owing to the coldness of the record, should be resolved in favor of the jury verdict. *The BMW Guideposts*

{20} In *BMW*, the Supreme Court held that courts assessing a punitive damages award's consistency with due process should consider three criteria: 1) the degree of reprehensibility of the defendant's misconduct; 2) the disparity between the harm (or potential harm) suffered by the plaintiff and the punitive damages award; and 3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases. 517 U.S. at 574–75, 116 S.Ct. 1589. We take up the Supreme Court's instruction that

> in our federal system, States necessarily have considerable flexibility in determining the level of punitive damages that they will allow in different classes of cases and in any particular case, ... For that reason, the federal excessiveness inquiry appropriately begins with an identification of the *state* interests that a punitive award is designed to serve.

*BMW*, 517 U.S. at 568, 116 S.Ct. 1589 (emphasis added). Certainly a state interest inheres in the New Mexico analysis which concentrates on two areas basically also comprising two of the *BMW* guideposts: the size of the verdict in light of the enormity and nature of the wrong considering aggravating and mitigating circumstances, and the relation between the amount of damages and the actual injury or actual damages sustained. As to the enormity and nature of the wrong, *see Marler v. Allen*, 93 N.M. 452, 453–54, 601 P.2d 85, 86–87 (Ct.App.1979) (" 'Enormity' is determined by the nature of the wrong committed and the aggravating circumstances shown."); *see also Clay v. Ferrellgas, Inc.*, 118 N.M. 266, 269, 881 P.2d 11, 14 (1994); *Green Tree Acceptance*, 108 N.M. at 174, 769 P.2d at 87; *Colbert v. Journal Publ'g. Co.*, 19 N.M. 156, 167, 142 P. 146, 149–50 (1914) (relying on *Day v. Woodworth*, 54 U.S. (13 How. 363) at 371); *Rodriguez v. Horton*, 95 N.M. 356, 360, 622 P.2d 261, 265 (Ct.App. 1980); *Galindo v. W. States Collection Co.*, 82 N.M. 149, 155, 477 P.2d 325, 331 (Ct.App. 1970). *Sweitzer v. Sanchez*, 80 N.M. 408, 412, 456 P.2d 882, 886 (1969). As to the relation between punitive damages and the actual injury sustained, *see First Nat'l Bank in Albuquerque v. Sanchez*, 112 N.M. 317, 325, 815 P.2d 613, 621 (1991); *Romero v. Mervyn's*, 109 N.M. 249, 259, 784 P.2d 992, 1002 (1989); *Green Tree Acceptance*, 108 N.M. at 174, 769 P.2d at 87; *Faubion v. Tucker*, 58 N.M. 303, 307, 270 P.2d 713, 716 (1954); *Weidler v. Big J Enter.*, 1998–NMCA–021, ¶ 45, 124 N.M. 591, 953 P.2d 1089; *Robison*, 101 N.M. at 396, 683 P.2d at 513; *Chavez–Rey*, 99 N.M. at 379, 658 P.2d at 454; *Wirth*, 96 N.M. at 346, 630 P.2d at 298; *Trigg v. Allemand*, 95 N.M. 128, 136, 619 P.2d 573, 581 (Ct.App.1980); *Marler*, 93 N.M. at 453–54, 601 P.2d at 86–87; *Christman v. Voyer*, 92 N.M. 772, 774, 595 P.2d 410, 412 (Ct.App.1979); *Sierra Blanca Sales Co. v. Newco Indus.* 84 N.M. 524, 543, 505 P.2d 867, 886 (Ct.App.1972); *Eslinger*, 80 N.M. at 481, 457 P.2d at 1000.

■ {21} As noted, we find that the first two guideposts of *BMW* are essentially equivalent to the two guiding factors we have identified in New Mexico jurisprudence. The first *BMW* guidepost, and "[p]erhaps the

most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." 517 U.S. at 575. As the Court stated nearly 150 years ago, exemplary damages imposed on a defendant should reflect "the enormity of his offense." *Id.* (quoting *Day,* 54 U.S. (13 How. 363) at 370). In general, as to both retaliatory discharge and defamation, there are at least two relevant sub-factors underlying reprehensibility, which relate to Plains' conduct. First, "evidence of repeated engagement in prohibited conduct knowing or suspecting it is unlawful is relevant support for a substantial award." *Weidler,* 1998–NMCA–021, ¶ 47, 124 N.M. 591, 953 P.2d 1089 (citing *BMW,* 517 U.S. at 575, 116 S.Ct. 1589). It is eminently clear, and the jury could easily have found, that Plains' behavior exhibited consciousness of wrongdoing, such that Defendant should have expected, or had notice, that legal punishment was likely. *See* Recent Cases, *Constitutional Law–Due Process Clause–Third Circuit Holds That $50 Million Punitive Damages Award In Context $48 Million Compensatory Award Is Unconstitutionally Excessive–Inter Medical Supplies, Ltd. v. EBI Medical Systems, Inc., 181 F.3d 446 (3d Cir.1999),* 113 Harv. L.Rev. 627, 627 (1999) (positing that "core holding" of *BMW* is that "large punitive damages awards are constitutional when a defendant has notice that his conduct may result in such awards)." The conduct culminating in Aken's retaliatory discharge had been ongoing for several years until a facially valid reason, however transparent, was found to administer the coup de grâce. The virtual conspiracy among Plains management to cast Aken as a thief, in order apparently to justify his termination to outsiders, was so intense as to invite the jury's (and our) conclusion that it was carried out consciously. The reprehensibility guidepost should be met given the "fraudulent, ongoing, and willful nature of defendants' conduct." Recent Cases, *supra,* at 632. Second, " 'trickery and deceit' " are considered more reprehensible than mere negligence. *BMW,* 517 U.S. at 576, 116 S.Ct. 1589 (quoting *TXO* 509 U.S. at 462, 113 S.Ct. 2711). Although trickery and deceit seemed to be more or less the order of the day at Plains,

with the endless horseplay and the manner, according to several witnesses, in which management ran the plant, it was focused particularly on Aken. Although he had been honored for his work, he was also made the target, if not an example, of what would happen if one dared to raise safety and harassment concerns. Thus, in the process of interpreting the record as some reasonable jury might and applying the first *BMW* factor, reprehensibility, we conclude that a substantial award was necessary to meet the goal of punishing Plains for its conduct and deterring it, and others similarly situated in the future, from engaging in such conduct. *See Rhein v. ADT Auto., Inc.,* 1996–NMSC–066, ¶ 30, 122 N.M. 646, 930 P.2d 783 (stating purpose of punitive damages is to punish wrongdoer and deter wrongdoer and others in a similar situation from engaging in such conduct in the future); *see also Torres v. El Paso Elec. Co.,* 1999–NMSC–029, ¶ 30, 127 N.M. 729, 987 P.2d 386.

{22} It should be noted with respect to Aken's claim for retaliatory discharge that the testimony at trial that his reporting safety problems met with an admonition that such action was "not conducive to long-term employment," was a thoroughly legitimate basis for a jury finding against Plains and its assessing punitive damages. This is the type of retaliatory discharge that is to be strongly discouraged in New Mexico through widespread publication of the jury verdict. When it is considered that the lives of New Mexico workers could be hanging in the balance, a strong deterrent is necessary. We have reservations, however, as to whether a $1,000,000 award was proper on Aken's defamation claim, an award based on Plains' vicarious liability for Chapman's statement to Twig Hollar that Aken had "stolen" a welder. A distinction must be made between the claims of retaliatory discharge and defamation. While the situation in this case was severe, only a portion is attributable to defamation. We will not condone or treat as insignificant the defamation, but we believe as far as punishing Plains for illegal conduct, an award is in order which is less suggestive of jury passion and prejudice. Further and specifically, we will reduce the award on this

claim from $1,000,000 to $300,000. In the record, Plains did display a heightened attitude of "spite, ill-will or vengeance" which would support a punitive damages award. 2 Rodney A. Smolla, *Law of Defamation* § 9.43 (2d ed.2001) [hereinafter Smolla], (citing cases).

 {23} The second guidepost in *BMW* is the "ratio [of punitive damages] to the actual harm inflicted on the plaintiff." 517 U.S. at 580, 116 S.Ct. 1589. It is important to note the difference between the first and second guideposts. The first guidepost requires comparing damages to the enormity of the defendant's wrong, apart from the injury actually sustained. The second guidepost represents a different vantage point on the punitive damages award, and considers the plaintiff's injury. As to this guidepost, in New Mexico, where there is "no rational relationship between the alleged acts [of the defendant] and the amount ... sought in punitive damages," the award may be found excessive. *Stanton v. Gordon Jewelry Corp.*, 108 N.M. 160, 161, 768 P.2d 888, 889 (1989). The test under the second guidepost in New Mexico is that "[t]he amount of an award of punitive damages must not be so unrelated to the injury and actual damages proven as to plainly manifest passion and prejudice rather than reason or justice." *Chavez–Rey*, 99 N.M. at 379, 658 P.2d at 454; *see also Coates v. Wal–Mart Stores, Inc.*, 1999–NMSC–013, ¶ 53, 127 N.M. 47, 976 P.2d 999.

{24} The ratios of the awards of the jury in this case were 3.5 to 1 for retaliatory discharge and 10 to 1 for defamation. In *TXO* the Court approved a punitive damages award that was approximately ten times greater than the potential harm caused by the defendant. *TXO*, 509 U.S. at 462, 113 S.Ct. 2711. The Court found the ratio justified in light of the "amount of money potentially at stake, the bad faith of petitioner, the fact that the scheme employed ... was part of a larger pattern of fraud, trickery and deceit, and petitioner's wealth." *Id.* The leading Tenth Circuit case, *Cont'l Trend Res., Inc. v. OXY USA, Inc.*, 101 F.3d 634, 639 (10th Cir.1996), interpreted *BMW* to impose a maximum ratio of ten to one for *economic* injury cases where the damage is

significant and *easily detected.* Here, the damage was not easily detected, and in a case involving injuries to health or safety, the ratio "might be much higher" than in *OXY USA. Weidler,* 1998–NMCA–021, ¶ 48, 124 N.M. 591, 953 P.2d 1089; *see also Allsup's,* 1999–NMSC–006, ¶ 49, 127 N.M. 1, 976 P.2d 1 (approving a multi-million dollar award with a ratio of 7.4 to one). In the instant case, as to retaliatory discharge, Plains' insidious and deceitful conduct, principally in running an operation based on intimidation and stifling employee input on safety and sexual harassment matters, which came to a head in the case of Plaintiff Aken, justifies an award 3.5 times greater than actual damages. It is consistent with our finding in considering the reprehensibility of Plains' defamation of Aken that a reduction to a ratio of 3 to 1 be imposed. An actual damages award of $100,000 is substantial in itself and thus a lower ratio does not make for an inappropriately low total, considering the harm to the plaintiff. We also note that Smolla cites with apparent approval James C. Goodale, Killing the Messenger, *N.Y.L.J.,* Feb. 7, 1997, at 3, who suggests, bearing in mind the actual harm to the plaintiff, a rule of 3 to 1 punitive to actual damages in defamation cases. *See* Smolla, *supra*, § 9:50 at 9–35.

{25} The third *BMW* guidepost is "[c]omparing the punitive damages award and the civil or criminal penalties that could be imposed for comparable misconduct." *BMW,* 517 U.S. at 583, 116 S.Ct. 1589. The third guidepost has been criticized as ineffective and very difficult to employ. First, with a definite idea of the amount of punitive damages that could be assessed against it, a wrongdoer would be capable of building the cost of the penalty into the cost of the product, at the same time maintaining low standards of product quality or business behavior. *See* Peter J. Sajevic, Casenote, *Failing the Smell Test: Punitive Damage Awards Raise the United States Supreme Court's Suspicious Judicial Eyebrow in BMW of North America, Inc. v. Gore,* 116 S.Ct. 1589 (1996), 20 Hamline L.Rev. 507, 547 (1996) ("Punitive damages eliminate the incentive to behave maliciously by allowing the jury to set the punitive damages award high enough to remove the profit from the malicious be-

havior."). This guidepost has also been criticized because "the Court did not give any guidance as to what to do if there are *not* any 'substantial legislative judgments concerning appropriate sanctions for the conduct at issue.' Not only is this guidepost vague, it is not even guaranteed to be applicable in future cases." Raising Five Eyebrows, *supra,* at 1823 (footnote omitted) (quoting *BMW,* 517 U.S. at 583, 116 S.Ct. 1589). We are satisfied that the award for retaliatory discharge and the decreased award we have imposed on the defamation claim are not too *low* so as to be absorbed by the industry and lose their deterrent effect. In any event, while reprehensibility is "the most important indicium," *BMW,* 517 U.S. at 575, 116 S.Ct. 1589 and the ratio factor is the "most commonly cited indicium," *id.* at 580, 116 S.Ct. 1589 the comparable sanctions factor is the least important indicium. As the Supreme Court of Alabama noted in *BMW* on remand, when statutory penalties for the conduct in question are low or do not exist, "a consideration of the statutory penalty does little to aid in a meaningful review of the excessiveness of the punitive damages award." *BMW of N. Am., Inc. v. Gore,* 701 So.2d 507, 514 (Ala.1997) (quoted in *Jimenez v. Chrysler Corp.,* 74 F.Supp.2d 548, 584 (D.S.C.1999)); *see also United Phosphorus, Ltd. v. Midland Fumigant, Inc.,* 205 F.3d 1219, 1231 (10th Cir.2000) (holding punitive damages award not constitutionally excessive even though the comparable civil/criminal penalty factor "len[t] credence to a smaller punitive award").

{26} Our own cases have expressed a dissatisfaction with the comparison urged by the third guidepost:

> "Without punitive damages there may be little to discourage an employer from discharging an employee if the pecuniary losses are insignificant. Further, the threat of a petty misdemeanor ... might in some instances provide insufficient deterrence to retaliatory discharge. The ability to recover punitive damages should offer a sufficient deterrent."

*Rhein,* 1996–NMSC–066, ¶ 30, 122 N.M. 646, 930 P.2d 783 (quoting *Vigil v. Arzola,* 102 N.M. 682, 690, 699 P.2d 613, 621 (Ct.App.

1983), *overruled on other grounds by Chavez v. Manville Prods. Corp.,* 108 N.M. 643, 647, 777 P.2d 371, 375 (1989)) (omission in original). Defendant Plains argues that the civil penalties for a willful or repeated violation of the Occupations Safety and Health Act, with a maximum penalty of $70,000 per violation, *see* 29 U.S.C. § 666(a) (1990), and the statutory cap of $300,000 on the sum of compensatory and punitive damages for intentional discrimination in employment under Title VII, *see* 42 U.S.C. § 1981a(b)(3)(D) (1994) indicate that the award in this case was too high. In *Weidler,* 1998–NMCA–021, ¶ 49, 124 N.M. 591, 953 P.2d 1089 however, the Court of Appeals held that the difference between the OSHA civil penalty and the punitive damages award was not helpful where, as here, the other two *BMW* factors weighed against it. We agree.

{27} Criminal libel is a misdemeanor. NMSA 1978, § 30–11–1 (1963). As such, possible penalties include a $1000 fine or imprisonment for up to one year, or both. NMSA 1978, § 31–19–1(A) (1984). The possibility of a jail sentence justifies a substantial punitive damages award. *See BMW,* 517 U.S. at 583, 116 S.Ct. 1589 (noting that the potential for imprisonment counterbalances the small size of a statutory fine); *see also Bielicki v. Terminix Int'l Co.,* 225 F.3d 1159, 1166 (10th Cir.2000) (upholding a punitive damages award of over $2,000,000 divided among three plaintiffs and noting that "[a]lthough the punitive damages award is exceptional when compared only to the applicable fines, the authorization of imprisonment in the criminal context can justify a higher award"). Thus, under the third guidepost, the award in this case is not excessive.

*CONCLUSION*

{28} The adequacy of New Mexico procedure in the punitive damages area and the fact that the defendant might have foreseen that its conduct would lead to a substantial legal penalty provide a solid basis on which to conclude that the awards as we have finally determined them in this case are substantively proper. We have examined the conduct of Defendant Plains, both from the point of view of the jury, best suited to judge the

conduct, and from the point of view of the somewhat unsettled law of the excessiveness of punitive damages, on the basis of which we have assessed the enormity of the wrong and the relation of punitive damages to the injury sustained. We affirm the trial court with an adjustment of the punitive award on Aken's defamation claim from $1,000,000 down to $300,000.

{29} IT IS SO ORDERED.

WE CONCUR: PATRICIO M. SERNA, Chief Justice, JOSEPH F. BACA, GENE E. FRANCHINI and PAMELA B. MINZNER, Justices (Recused).