OPINION VANZI, Judge. {1} Plaintiff-Appellee Dr. Emre Yedidag was terminated from his position as a general surgeon by his employer Defendants-Appellants Roswell Clinic Corporation and Roswell Hospital Corporation d/b/a Eastern New Mexico Medical Center (collectively, Eastern). Dr. Yedidag’s termination occurred within days after he participated in an internal hospital surgical peer review meeting that included review of surgical care provided by one of Dr. Yedidag’s colleagues at Eastern. Following the peer review meeting, two Eastern employees who were present at the meeting disclosed to Eastern administrators their belief that Dr. Yedidag had engaged in unprofessional and aggressive behavior at the peer review meeting. Dr. Yedidag filed suit against Eastern following his termination, alleging that he was fired as a result of his participation in the peer review meeting. The jury determined that Eastern violated the New Mexico Review Organization Immunity Act (the ROIA), NMSA 1978, §§ 41-9-1 to -7 (1979, as amended through 2011), and breached an implied promise in Dr. Yedidag’s employment agreement that he would not face adverse employment consequences as a result of his participation in the hospital’s peer review process. {2} Eastern’s primary argument on appeal is that the district court erred in allowing Dr. Yedidag to bring a private cause of action under the ROIA. Eastern also raises arguments regarding the propriety of the implied promise contractual cause of action, the jury’s award of punitive damages, the jury polling process, the admission of medical evidence-at trial, and the award of attorney fees. As a matter of first impression, we hold that a member of a peer review organization can bring a private cause of action for an alleged violation oftheROIA’s confidentiality provision, Section 41-9-5. We also conclude that the district court did not err with respect to Eastern’s remaining arguments. Accordingly, we affirm the jury verdict. BACKGROUND A. The ROIA {3} Because this appeal raises issues regarding the application of the ROIA in a civil action, we turn first to provide some background on the ROIA. Enacted by the Legislature in 1979, the ROIA “established] a comprehensive scheme of regulation of hospital peer review proceedings, including the scope of immunity available to members of a review organization” and the confidentiality of the records of review organizations. Leyba v. Renger, 114 N.M. 686, 687, 845 P.2d 780, 781 (1992); see also SW. Cmty. Health Servs. v. Smith, 107 N.M. 196, 198, 755 P.2d 40, 42 (1988) (recognizing that the “ROIA establishes a medical peer review process to promote the improvement of health care in New Mexico”). Under the ROIA, hospital review organizations are limited in membership to “health care providers and staff, except where otherwise provided for by state or federal law,” and are tasked with gathering and reviewing information relating to the care and treatment of patients for eight enumerated purposes. See § 41-9-2(E). {4} The ROIA grants qualified immunity to members of review organizations and to individuals who provide information to review organizations. See § 41-9-4 (providing that members of review organizations shall not be liable “for damages or other relief in any action brought by a person or persons whose activities have been or are being scrutinized or reviewed by a review organization . . . unless the performance of such duty, function or activity was done with malice toward the person affected thereby”); see also § 41-9-3 (stating that “[n]o person providing information to a review organization shall be subject to any action for damages or other relief. .. unless such information is false and the person providing such information knew or had reason to believe such information was false”); Leyba, 114 N.M. at 687-88, 845 P.2d at 781-82 (holding that the ROIA establishes qualified immunity). {5} Of particular relevance to this case is Section 41-9-5, which deals with the confidentiality of review organization meetings. Section 41-9-5(A) provides that all data and information acquired by a review organization in the exercise of its duties and functions shall be held in confidence and shall not be disclosed to anyone except to the extent necessary to carry out one or more of the purposes of the review organization or in a judicial appeal from the action of the review organization. No person described in Section 41-9-4 [of the ROIA] shall disclose what transpired at a meeting of a review organization except to the extent necessary to carry out one or more of the purposes of the review organization, in a judicial appeal from the action of the review organization or when subpoenaed by the New Mexico medical board. (Emphasis added.) As we discuss in later sections of this Opinion, this appeal involves claims by Dr. Yedidag that Eastern employees allegedly violated Section 41-9-5 by disclosing what transpired at a peer review meeting and that, as a result of Eastern’s alleged violation of the ROIA, Dr. Yedidag faced adverse employment consequences and suffered damages. B. Case History {6} Dr. Yedidag began working as a general surgeon for Eastern on December 5,2005, and was terminated from his position nearly eleven months later on November 17, 2006. Two days prior to his termination, Dr. Yedidag attended and participated in a meeting of the Surgical Performance Improvement Committee at Eastern (the peer review meeting). According to documents in the record before this Court on appeal, the meeting was attended by five physicians, including Dr. Yedidag and the colleague whose surgical care and treatment of a patient would eventually be discussed at the peer review meeting. Also present at the meeting were four members of Eastern’s administration and management staff, including Sara Williamson and Barbara Harned. During the peer review meeting, Dr. Yedidag participated in the review of his colleague’s surgical care and treatment of a patient. Since the physician whose case was under review was also present at the peer review meeting, Dr. Yedidag questioned the physician regarding the surgical treatment given and the events that led to the patient’s death. At the conclusion of the meeting, the peer review members requested that the case be sent for external review by a general surgeon. {7} Immediately after the peer review meeting ended, members of Eastern’s administration and management staff who were present at the meeting, including Sara Williamson, reported to Rich Robinson, Eastern’s CEO, and Michael Kuelcer, Dr, Yedidag’s immediate supervisor, that Dr. Yedidag had engaged in unprofessional and aggressive behavior at the peer review meeting. At trial, ICeuker testified that he was told that Dr. Yedidag had verbally attacked the colleague whose case was under review at the meeting, and Sara Williamson testified that she told Eastern administrators that Dr. Yedidag had engaged in extremely disruptive behavior at the peer review meeting. {8} The next day, Kueker met with Dr. Yedidag to suspend him from his position. On November 17, 2006, Dr. Yedidag received a letter from Eastern terminating his employment. The letter did not mention the events of the peer review meeting and instead stated that Dr. Yedidag’s termination was pursuant to Paragraphs 10.1(j), 10.1 (k), and 10.1(m) of Dr. Yedidag’s employment agreement with Eastern and was a result of his “continued unprofessional behavior and language” and “continued disruptive behavior.” These provisions of the employment agreement provided for immediate termination based upon: (j) [Eastern’s] determination that [Dr. Yedidag’s] continued employment would pose an unreasonable risk of harm to patients or others or would adversely affect the confidence of the public in the services provided by [Eastern]; (k) [Eastern’s] determination that [Dr. Yedidag] has engaged in gross insubordination or gross dereliction of duty; (m) conduct by [Dr. Yedidag] which is reasonably considered by [Eastern] to be unethical, unprofessional, fraudulent, unlawful, or adverse to the interest, reputation or business of [Eastern.] {9} On January 24, 2007, Dr. Yedidag filed an eight-count civil complaint against Eastern seeking monetary damages and other relief as a result of his termination. An amended complaint later filed by Dr. Yedidag consisted of the following specific causes of action: fraud in the peer review process; violation of the ROIA’s confidentiality provision; breach of Dr. Y edidag’s employment agreement with Eastern; breach of the covenant of good faith and fair dealing; retaliatory discharge; civil conspiracy; and prima facie tort. In response to Dr. Yedidag’s lawsuit, Eastern took the position throughout the proceedings below that Dr. Yedidag was terminated for cause pursuant to his employment agreement with Eastern due to his unprofessional conduct. {10} At trial, the claims that were submitted to the jury pertinent to disposition of this appeal were: (1) violation of the ROIA, and (2) breach of implied promises in Dr. Yedidag’s employment agreement with Eastern. With regard to the ROIA claim, the jury was instructed to determine whether Eastern “breach[ed] the confidentiality requirement of [the ROIA] through its disclosure of Dr. Yedidag’s actions at the . .. peer review . . . meeting by Sara Williamson to Eastern’s CEO and Eastern’s Physician Practice Coordinator, who were not members or participants in the . . . peer review [meeting].” As for the implied promises claims, the jury was instructed to find whether Eastern had breached three implied promises located within Dr. Yedidag’s employment agreement. {11} The jury returned a special verdict in favor of Dr. Yedidag, finding that (1) Eastern violated the ROIA, and (2) Eastern breached its employment agreement with Dr. Yedidag by breaching an implied promise that there would be no adverse consequences to Dr. Yedidag’s employment or staff privileges as a consequence of his participation in the peer review process. The jury further determined that both of the foregoing were a proximate cause of Dr. Yedidag’s damages, and it awarded Dr. Yedidag $997,814 in compensatory damages and three million dollars in punitive damages. This appeal followed. We will relate additional background as necessary to our discussion of each issue raised on appeal. DISCUSSION {12} Eastern raises six arguments on appeal. Eastern’s primary argument is that the district court erred in allowing Dr. Yedidag to bring a private cause of action under the ROIA. Eastern also raises arguments regarding the propriety of the implied promises contractual cause of action, the jury’s award of punitive damages, the jury polling process, the admission of medical evidence at trial, and the award of attorney fees. We address each argument in turn. 1. Private Cause of Action Under the ROIA {13} At the center of this appeal is the issue of whether a private civil cause of action can arise from violation of Section 41-9-5, the ROIA’s confidentiality provision. Eastern contends that the district court improperly permitted Dr. Yedidag to bring a cause of action for damages and other relief against Eastern for an alleged violation of Section 41-9-5. The parties agree that the ROIA does not expressly provide for a private cause of action arising from violation of Section 41-9-5. In fact, we note that the only remedy expressly identified in the ROIA for Section 41-9-5 violation is criminal in nature. See § 41-9-6 (providing that any unauthorized disclosure of data or information acquired by a review organization or of what transpired at a review organization meeting is punishable as a petty misdemeanor). However, the district court determined that a private cause of action can exist under the ROIA for violation of Section 41-9-5. Our review of the district court’s ruling presents a matter of first impression for this Court. {14} The question of whether a statute creates or implies a private cause of action is a question of law that we review de novo. See Sedillo v. N.M. Dep't of Pub. Safety, 2007-NMCA-002, ¶ 7, 140 N.M. 858, 149 P.3d 955. Generally speaking, there are only a handful of cases in New Mexico that have addressed the creation of a private cause of action for statutory violations where a statute does not expressly provide for such an action. See, e.g., Hovet v. Allstate Ins. Co., 2004-NMSC-010, ¶ 9, 135 N.M. 397, 89 P.3d 69 (determining, based on legislative intent and public policy, that third-party claimants may bring a cause of action under the Insurance Code for unfair claims practices where the statute at is'sue already provided for a general cause of action); Starko, Inc. v. Presbyterian Health Plan, Inc., 2012-NMCA-053, ¶¶ 28, 33-42, 276 P.3d 252 (recognizing a private cause of action arising under a statutory provision of'the Public Assistance Act), cert. granted, 2012-NMCERT-003, 293 P.3d 184; Sedillo, 2007-NMCA-002, ¶¶ 1, 8-17 (addressing whether the Peace Officer’s Employer-Employee Relations Act provides a private cause of action); Nat’l Trust for Historic Pres. v. City of Albuquerque, 117 N.M. 590, 592-94, 874 P.2d 798, 800-02 (Ct. App. 1994) (recognizing a private cause of action under the New Mexico Prehistoric and Historic Sites Preservation Act and determining that the plaintiffs had standing to bring such an action). {15} In this case, Eastern’s argument involves an examination of three nonexclusive factors first enunciated by this Court in National Trust for determining whether a private cause of action can be implied for a statutory violation in the absence of an explicit statutory directive.[1] 117 N.M. at 593, 874 P.2d at 801. These factors are as follows: “(1) Was the statute enacted for the special benefit of a class of which the plaintiff is a member?[;] (2) Is there any indication of legislative intent, explicit or implicit, to create or deny a private remedy?}; and] (3) Would a private remedy either frustrate or assist the underlying purpose of the legislative scheme?” Id. In addition, “[a] state’s public policy, independent of [these] factors, may be determinative in deciding whether to recognize a cause of action.” Id. at 594, 874 P.2d at 802. Before addressing Eastern’s arguments based on these factors as well as public policy, we turn first to address two preliminary arguments advanced by Eastern. {16} Eastern initially argues against the recognition of a private cause of action for a Section 41-9-5 violation due to Dr. Yedidag’s failure during trial proceedings to present any case precedent that has allowed for a private cause of action under the ROIA in an employment case. However, neither party has presented this Court with case law, either from New Mexico or from another jurisdiction, that has previously addressed the precise issue before the Court: whether a state peer review immunity statute, such as the ROIA, allows a member of a review organization to bring a private cause of action for damages and other relief as a result of a violation of the statute’s confidentiality provision. Thus, in the absence of authority going one way or the other on this issue, we are not compelled by Eastern’s argument that we should decline to recognize a private cause of action simply because it is a matter of first impression for this Court. {17} Eastern next argues that the creation of a private cause of action under the ROIA is improper because the ROIA already provides a criminal penalty. See § 41-9-6. In support of this argument, Eastern cites to authority from other jurisdictions that have held that courts will not generally create a private cause of action where a statute provides a penalty for violation but does not specifically provide for a private cause of action. See, e.g., Youren v. Tintic Sch. Dist., 2004 UT App 33, ¶ 4, 86 P.3d 771. While we acknowledge that such authority exists in other jurisdictions, these cases are not controlling, and Eastern does not point to any New Mexico authority that has adopted this reasoning. In addition, we are aware of New Mexico cases that have looked beyond the simple question of whether a statutory scheme already includes an express legal remedy in determining whether to recognize a private cause of action for a statutory violation. In resolving this question, these cases have examined the adequacy of the legal remedy already provided by the statute at issue or, alternatively, whether the legal remedy already provided for would be frustrated by the imposition of additional remedies through a private cause of action. See Cal. First Bank v. State, 111 N.M. 64, 74-75, 801 P.2d 646, 656-57 (1990) (determining that the administrative remedies already provided for by statute were “not of such a comprehensive nature and scope that they would be frustrated by imposition of tort liability” via a private cause of action); see also State ex rel. Educ. Assessments Sys., Inc. v. Coop. Educ. Servs. of N.M., Inc., 115 N.M. 196, 200-02, 848 P.2d 1123, 1127-29 (Ct. App. 1993) (declining to recognize a private cause of action for disappointed offerors, in part, based on this Court’s determination that the remedies already provided under the Procurement Code were adequate to protect the disappointed offerors). We are therefore reluctant to rest our analysis of whether a private cause of action can arise for violation of Section 41-9-5 solely on the fact that the ROIA already prescribes a criminal penalty for this violation. {18} We thus turn to consider Eastern’s argument against the recognition of a private cause of action based on the three nonexclusive factors set forth in National Trust. As we set forth in greater detail below, weighing of these factors as well as public policy leads us to conclude that a private cause of action can arise for violation of Section 41-9-5. {19} We first analyze whether Dr. Yedidag is a member of a class for whose special benefit the ROIA was enacted. See Nat’l Trust, 117 N.M. at 593, 874 P.2d at 801 (stating that the first factor is whether the statute was enacted for the special benefit of a class of which the plaintiff is a member). In our view, one class of individuals that the Legislature clearly intended to protect by enacting the ROIA is members of a review organization — i.e., those individuals who directly participate in the peer review process. Protection of members of review organizations is achieved in two primary ways under the ROIA: (1) by providing qualified immunity to members of review organizations, and (2) by maintaining confidentiality during the peer review process by limiting discovery of data and information gathered during the peer review process as well as restricting disclosure of what transpired at meetings.[2] See § 41-9-4 (providing that members of review organizations shall not “be liable for damages or other relief in any action brought by a person or persons whose activities have been or are being scrutinized or reviewed by a review organization . . . unless the performance of such duty, function or activity was done with malice toward the person affected thereby”); see also § 41-9-5(A) (providing that no member of a review organization “shall disclose what transpired at a meeting of a review organization except to the extent necessary to carry out one or more of the purposes of the review organization, in a judicial appeal from the action of the review organization or when subpoenaed by the New Mexico medical board”). Our determination that the ROIA was enacted, in part, to protect peer review participants is comparable to other cases that have similarly noted that these statutes were designed to protect those who engage in the peer review process as participants. See, e.g., Goldsmith v. Harding Hosp., Inc,, 762 F. Supp. 187, 188 (S.D. Ohio 1991) (stating that the chief beneficiaries of the HCQIA are the professional review bodies that are accorded immunity from liability for damages); Cooper v. Del. Valley Med. Ctr., 654 A.2d 547, 554 (Pa. 1995) (reiterating that the legislature’s clear purpose in enacting that state’s peer review statute was to protect peer review participants). Since it is undisputed that Dr. Yedidag was a member of a review organization as defined in the ROIA, we conclude that he is a member of a class that the ROIA was enacted to specially benefit. {20} Next, we consider whether there is any indication of legislative intent, either explicit or implicit in the ROIA, to create or deny a private remedy to Dr. Yedidag. See Nat‘l Trust, 117 N.M. at 593, 874 P.2d at 801. As we stated earlier, one indication that the Legislature did not intend to permit private remedies for violation of Section 41-9-5 is the fact that the ROIA expressly provides a criminal penalty for violation of this provision. See § 41-9-6. However, there is no indication in the language of Section 41-9-6 that the criminal penalty — although mandatory in nature — was intended to be the exclusive remedy for violation of the ROIA’s confidentiality provision.[3] Without undermining the Legislature’s judgment that the criminal penalty protects against unauthorized disclosures of what transpired at a review organization meeting, we are unable to conclude that there is any explicit or implicit language in the ROIA that the Legislature intended to deny private remedies for peer review participants who face adverse employment consequences as a direct result of their participation in the process. Eastern also argues that there is no indication of legislative intent to create a private remedy under the ROIA because the ROIA was “created to improve health care in New Mexico and as such, it has an aggregate focus, not ail individual focus.” See Starko, 2012-NMCA-053, ¶ 35 (relying on United States Supreme Court case law that evaluates legislative intent to create a private remedy by examining, among other factors, whether the statute has an “aggregate, not individual, focus” (internal quotation marks and citation omitted)). We disagree. The protections afforded under the ROIA to peer review participants are individual in nature and promote the aggregate integral purpose of the statute — the improvement of health care in New Mexico and protection of the general public — by ensuring effective professional peer review through a candid, frank, and critical evaluative process. See Sw. Cmty. Health Servs., 107 N.M. at 198, 755 P.2d at 42 (stating that the ROIA “recognizes that candor and objectivity in the critical evaluation of medical professionals by medical professionals is necessary for the efficacy of the review process”). {21} Turning to the third factor, we conclude that a private remedy for a violation of Section 41-9-5 will not frustrate the underlying purposes of the ROIA. See Nat’l Trust, 117 N.M. at 593, 874 P.2d at 801 (stating that the third factor is an examination of whether a private remedy will either frustrate or assist the underlying purpose of the legislative scheme). As we have noted, the overall purpose of the ROIA, which is to promote the improvement of health care in New Mexico, is furthered through the protections afforded under the ROIA to members of review organizations. See Sw. Cmty. Health Servs., 107 N.M. at 198, 755 P.2d at 42; see also Leyba, 114 N.M. at 689, 845 P.2d at 783 (emphasizing that the ROIA “reflects a reasoned balance between the competing needs of the public for frank and accurate review of a physician’s qualifications and the needs of physicians being credentialed for a fair and impartial review process”). Specifically, the confidentiality provision of the ROIA, and chiefly Section 41-9-5, serve to ensure an effective peer review process by promoting participation in the process by physicians and other medical professionals. Thispro vision offers security to members that, assuming they are acting to carry out one or more of the purposes of the review organization, they will not suffer personal or professional harm as a result of their participation in, or based on the data and information shared in the process or the communications made during the process. If members of review organizations are subject to adverse employment consequences as a result of their participation in the peer review process, there will be a chilling effect on future participation by medical professionals in the process. Such a result is clearly contrary to what the Legislature intended when it enacted the ROIA. Allowing a private remedy for a violation of Section 41-9-5 would not frustrate the underlying purposes of the ROIA. {22} In arguing that the ROIA should not be interpreted under the National Trust factors to provide for a private right of action, the dissent expresses concern regarding the reach of our holding. In particular, the dissentraises doubt that the Legislature intended to absolutely immunize from discipline all conduct by a member of a review organization during the peer review process and goes on further to point to a number of hypothetical scenarios during a peer review meeting that it maintains should not be protected from disclosure, However, as the dissent acknowledges, the language of Section 41-9-5(A) prohibits the disclosure of what transpired at a meeting of a review organization “except to the extent necessary to carry out one or more of the purposes of a review organization.” Thus, the disclosure provision is not absolute in nature, and our holding assumes that a member of a review organization was acting to carry out one or more purposes of the review organization. {23} B ased on the foregoing, we conclude that a private cause of action can arise for violation of Section 41-9-5 and, therefore, the district court did not err in submitting this cause of action to the jury. 2. Breach of Implied Promise {24} Eastern argues that the district court erred in allowing Dr. Yedidag to submit a claim to the jury that Eastern violated Dr. Yedidag’s employment agreement by breaching an implied promise within the agreement that Dr. Yedidag would not suffer adverse employment consequences as a result of his participation in the peer review process. The jury determined that Eastern breached this implied promise. As we understand its argument, Eastern contends that the claim should not have been submitted to the jury because Dr. Yedidag’s employment agreement controlled the manner and methods by which he could be terminated, and the implied promise improperly contradicted the express terms of the agreement. {25} We are not persuaded. Eastern appears to argue that the implied promise contradicts the express termination provisions in the employment agreement because it precluded Eastern from considering Dr. Yedidag’s conduct during the peer review meeting as a basis for termination. Eastern states that implied promises cannot contradict the express terms of a contract; however, we are not convinced that the implied promise that Eastern takes issue with actually contradicts the express terms ofDr. Yedidag’s employment agreement. The jury found that Eastern breached an implied promise that Dr. Yedidag would not suffer adverse consequences to his employment or staff privileges as a result of his participation in the peer review process. There is nothing in the language in this particular implied promise, as submitted to the jury on the special verdict form, that the implied promise was meant to encompass conduct in addition to Dr. Yedidag’s participation in the peer review process. The district court did not prevent Eastern from arguing throughout trial that it terminated Dr. Yedidag as a result of what Eastern considered to be unprofessional conduct during the peer review process. There is no dispute that Eastern was able to present evidence and argument at trial as to its interpretation of the employment agreement as well as its view of the implied promise raised by Dr. Yedidag as a basis for termination. We conclude that there was no error. 3. Award of Punitive Damages {26} Eastern challenges the jury’s award of punitive damages on two grounds, arguing that (1) there was insufficient evidence to support the award, and (2) the award violates due process. {27} We first consider Eastern’s argument that the punitive damages award was not supported by sufficient evidence. Punitive damages are awarded for the purposes of punishing wrongdoing and deterring both the wrongdoer and others from the commission of similar offenses. Madrid v. Marquez, 2001-NMCA-087, ¶ 4, 131 N.M. 132, 33 P.3d 683. In order to support an award, there must be some evidence of a culpable mental state on the part of Eastern. In this case, the jury was instructed that it could award punitive damages against Eastern if it found that “the conduct of Rich Robinson, Sara Williamson, Michael Keuker, or Barbara Harned was malicious, willful, reckless, wanton, fraudulent or in bad faith}.]” On appeal, Eastern contends that the punitive damages award was not supported by sufficient evidence because Eastern terminated Dr. Yedidag after consulting with legal counsel and because the law was unsettled as to whether the ROIA protected Dr. Yedidag from facing adverse employment consequences as a result of the peer review process. Eastern argues that this case is similar to Lujan v. Pendaries Properties, Inc., 96 N.M. 771, 775, 635 P.2d 580, 584 (1981), a case where the Supreme Court reversed an award of punitive damages because the defendant had acted on the advice of counsel and because he had taken a legal position that was not without some justification. However, our review of Lujan indicates that this was not the sole basis for the Supreme Court’s decision to vacate the punitive damages award. Significantly, the Court there also considered the other evidence cited in support of the district court’s award of punitive damages and found that this evidence was insufficient to show that the defendant had acted with a culpable mental state. Id. Thus, we disagree with Eastern that Lujan stands for the proposition that an award for punitive damages may be vacated solely because the defendant acted based on .the advice of counsel. Rather, it is one fact that may be considered, amongst others, in determining whether there was sufficient evidence to support an award of punitive damages. {28} Aside from citing to testimony from an Eastern administrator that he terminated Dr. Yedidag after consulting with legal counsel, Eastern fails to show why the jury could not have reasonably inferred from the other evidence presented at trial that Eastern acted maliciously, willfully, recklessly, wantonly, fraudulently, or in bad faith. As a result of Eastern’s failure to sufficiently develop its argument and present the facts necessary for our review of its sufficiency challenge, we do not consider its argument any further. See Martinez v. Sw. Landfills, Inc., 115 N.M. 181, 186, 848 P.2d 1108, 1113 (Ct. App. 1993) (stating that the appellate court will not consider an insufficiency of evidence argument without presentation of the evidence as a whole or based only on facts that tend to support the argument). {29} We next consider Eastern’s argument that the punitive damages award violates due process. Whether an award of punitive damages comports with constitutional due process is a question of law that we review de novo. Aken v. Plains Elec. Generation & Transmission Coop., Inc., 2002-NMSC-021, ¶ 19, 132 N.M. 401, 49 P.3d 662. Following BMW of North America, Inc. v. Gore, 517 U.S. 559, 575 (1996), our review takes three criteria into account: “[(1)] the degree of reprehensibility of the defendant’s misconduct}, (2)] the disparity between the harm (or potential harm) suffered by the plaintiff and the punitive damages award},] and [(3)] the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases.” Alcen, 2002-NMSC-021, ¶ 20. Eastern makes no argument as to the first and third BMW of North America factors and instead makes a cursory argument as to the second factor. It contends that the amount of the punitive damages award was so unrelated to the injury as to “plainly manifest passion and prejudice rather than reason or justice},]” Alcen, 2002-NMSC-021, ¶ 23 (internal quotation marks and citation omitted), because: (1) the award was not based on a bad faith breach of Dr. Yedidag’s employment agreement, and (2) the award was based on the ROIA claim that does not exist. We disagree. As we have already determined, the ROIA claim was validly submitted to the jury and therefore could have served as a basis for the award of punitive damages. And although the jury found that Eastern did not violate a duty of good faith and fair dealing implied in Dr. Yedidag’s employment agreement, Eastern fails to explain why the jury nevertheless could not have found that Eastern acted in bad faith. Nor does Eastern explain why the jury’s award of punitive damages could not have been based on malicious, willful, or reckless conduct as those terms were defined in the jury instruction on punitive damages. Finally, like its approach to the other arguments it raised on appeal, Eastern’s briefing failed to otherwise undertake any traditional analysis of the second BMW of North America factor that would permit meaningful review of the constitutional muster of the punitive damages award. See 517 U.S. at 560. We therefore conclude that there is no basis to reverse the award of punitive damages on constitutional due process grounds. 4. Jury Polling {30} Eastern argues that the district court committed reversible error by sending the jury back to the jury room for further deliberations on the proximate cause question tied to Dr. Yedidag’s breach of contract claim as a result of the colloquy between the district court and the jury during the course of polling. Eastern contends that the district court’s actions were coercive and constituted impermissible “verdict-urging.” {31} To provide context, we first provide the relevant portion of the special verdict form as well as the colloquy between the district court and the jury during polling. With regard to Dr. Yedidag’s breach of contract claim, the special verdict read as follows: 3. Did Eastern breach its employment contract with Dr. Y edidag? _YES___NO 3A. Ifyou have answered Yes to this Question, please indicate by a check in the appropriate blank the violation found. _ Eastern breached its implied promise that there would be no adverse consequences to Dr. Yedidag’s employment or staff privileges as a consequence of his participation in the peer review process. Eastern violated its duty of good faith and fair dealing .... ____ Eastern’s discharge of Dr. Yedidag for being a disruptive employee did not conform .... 3B. Also put Yes in each appropriate blank if you found that any violation checked above if that violation was a proximate cause of Dr. Yedidag’s damages. After the jury concluded its deliberations and returned to the courtroom with its verdict, the district court proceeded to review the completed special verdict form. With regard to the above questions, the district court stated that the jury had answered “Yes” to Question 3 and had placed a check mark in the blank for the first violation listed under Question 3A. The court then stated that in response to Question 3B, the jury had not placed a “Yes” next to the check mark. The following specific exchange occurred between the court and the jury foreperson regarding Question -3B: THE COURT: [Question] 3B indicated [to] put [Y]es in each appropriate blank if you found that any violation checked above ... was a proximate cause of Dr. Yedidag’s damages[. T]here is no [Y]es next to the subsection. THE FOREPERSON: Did we forget something? THE COURT: Do you want to go back in— THE FOREPERSON: I think the way we have it is the way we wanted it. The court then continued to read the jury’s answers on the remainder of the special verdict form. Thus, the initial answers on the special verdict form indicated that the jury did not find that Eastern’s violation of the implied promise was a proximate cause of Dr. Yedidag’s damages. {32} At Eastern’s request, the district court then proceeded to poll the jury, during which the following colloquy occurred regarding Question 3B: THE COURT: [ T ] h e next question was also put [Y]es in each appropriate blank if you found that any violation checked above, if that violation was a proximate cause of Dr. Yedidag’s damages. With regard to the one [violation] that you checked, there is no [Y]es next to it, was that your decision? THE CLERK: [Juror] 74? [JUROR 74]: Yes, I guess. I’m lost again. THE COURT: Maybe what we should do is have the jury go back in to consider that one question. And, ladies and gentleman, you have found — at least five of you have checked off this bottom one. You need to next answer if you feel that was aproxímate cause of damages [,] you need to write [Y]es next to it[;] if you don’t, leave it — don’t put yes next to it. Okay. So we’ll send the jury back in. . . . [Eastern]: Before we did do that, . . . could [we] object to sending them baclc[?.] .... THE COURT: Let me just state that the jury was requested to be polled. We were polling the jury, the jury expressed confusion with regard to that question. I have asked them and I believe instructed them correctly as to if they intended [Y]es[,] they needed to put it, if they didn’t, they didn’t. They’re simply going to clarify for purposes of polling so the objection is overruled. When the jury returned from the jury room, the special verdict form included a “Yes” in answer to Question 3B next to the checked violation of an implied promise. The district court re-polled the jury on Question 3B, and all six jurors indicated their assent to the answer to Question 3B. {33} Eastern argues on appeal that the district court improperly overruled its objection. We disagree. The district court did not err in permitting the jury to return to the jury room for further deliberations with regard to Question 3B. As this Court stated in Sanchez v. Martinez, 99 N.M. 66, 73, 653 P.2d 897, 904 (Ct. App. 1982), “[f|undamental justice requires that a verdict returned by a jury be certain as to its import, and be free from ambiguity or inconsistency.” “The object of a poll is to give each juror an opportunity, before the verdict is recorded, to declare in open court his assent to the verdict which the foreman has returned and thus to enable the court and the parties to ascertain for a certainty that each of the jurors approves of the verdict as returned.” State v. Holloway, 106 N.M. 161, 164, 740 P.2d 711, 714 (Ct. App. 1987) (internal quotation marks and citation omitted); see 75B Am. Jur. 2d Trial § 1523 (observing that “[t]he jury poll is the primary device for uncovering the doubt or confusion of individual jurors”). Here, the response given by Juror 74 during the polling of Question3B indicated that the juror was uncertain or confused as to his/her answer to that question. Under these circumstances, it was not improper for the district court to send the jury back for further deliberations. See Holloway, 106 N.M. at 165, 740 P.2d at 715 (indicating that “[t]he trial court . . . has discretion respecting the proper remedial measures which should be taken when polling reveals that a juror’s verdict is uncertain or qualified[,] . . . [including] directing the jury to retire to continue its deliberations”); see also Rule 1-038(F) NMRA (providing that in civil cases, “[ejither party may require the jury to be polled, which is done by the court or clerk, asking each juror if it is the juror’s verdict; if upon such inquiry or polling, more than one of the jurors disagree thereto, the jury must be sent out again” for further deliberations). {34} Eastern also contends thatthe district court’s statements to the jury during polling were coercive and that the court urged the jury during polling to change its answer to Question 3B. Our review of the polling indicates that the district court’s statements to the jury regarding Question 3B were neutral in form and substance. To the extent that Eastern takes issue with the fact that the jury changed the special verdict form and answered “Yes” to Question 3B during the additional deliberations, the general rule is that there is no final verdict until the jury has been discharged. See Hurst v. Citadel, Ltd., 111 N.M. 566, 570, 807 P.2d 750, 754 (Ct. App. 1991). Because the jury was not discharged in this case until after further deliberations were completed, the jury was permitted to change the form and substance of its verdict to coincide with its intention during the course of those additional deliberations. We conclude that there is no basis for reversal on this issue. 5. Admission of Medical Evidence {35} Eastern summarily argues that the district court erred in admitting evidence in the form of medical records and physician testimony concerning the medical case that was the subject matter of the peer review meeting. We review the admission of evidence for an abuse of discretion. See Nelson v. Homier Distrib. Co., 2009-NMCA-125, ¶ 29, 147 N.M. 318, 222 P.3d 690. “An abuse of discretion occurs when the ruling is clearly against the logic and effect of the facts and circumstances of the case.” Wilde v. Westland Dev. Co., 2010-NMCA-085, ¶ 30, 148 N.M. 627, 241 P.3d 628 (internal quotation marks and citation omitted), {36} Eastern’s argument is limited in length and scope; in the span of a few sentences, Eastern broadly argues that the evidence was improperly admitted because it was unduly prejudicial and that it “likely influenced the jury.” Although Eastern provides record citations for the evidence it alleges was improperly admitted, Eastern fails to give a detailed description of the evidence and fails to explain, with appropriate supporting authority, why the district court’s relevancy determinations regarding the evidence were incorrect. Eastern’s undeveloped argument precludes meaningful appellate review of its relevancy argument. See Headley v. Morgan Mgmt. Corp., 2005-NMCA-045, ¶ 15, 137 N.M. 339, 110 P.3d 1076 (stating that this Court “will not review unclear arguments, or guess at what [a party’s] arguments might be”). {37} To the extent that Eastern contends the evidence was unduly prejudicial, we are again unpersuaded due to Eastern’s failure to adequately develop this argument. Eastern provides no explanation as to why the evidence was unduly prejudicial and fails to cite to any supporting authority. We also observe that Eastern’s briefing ignores the fact that the district court issued, at Eastern’s request, a limiting instruction to the jury regarding the use of the medical evidence at trial. We assume that the jury followed the court’s instruction absent evidence to the contrary. See Norwest Bank N.M., N.A. v. Chrysler Corp., 1999-NMCA-070, ¶ 40, 127 N.M. 397, 981 P.2d 1215 (recognizing that the jury is presumed to follow the court’s instruction). Eastern did not object to the content of the limiting instruction when it was given at trial, and on appeal, Eastern makes no argument as to why the limiting instruction was not adequate to overcome the prejudice that it contends allegedly resulted from the admission of the evidence. Thus, we affirm the district court’s ruling regarding the admission of the medical evidence. 6. Attorney Fees {38} Eastern’s final argument on appeal challenges the district court’s award of attorney fees to Dr. Yedidag. We review an award of attorney fees for an abuse of discretion. See N.M. Right to Choose/NARAL v. Johnson, 1999-NMSC-028, ¶ 6, 127 N.M. 654, 986 P.2d 450. However, we review the application of the law to the facts de novo. Id. ¶ 7. New Mexico follows the American rule regarding attorney fees, which is that, absent statutory authority, court rule, or contractual provision, litigants are responsible for their own attorney fees. ¶ 9. In this case, the award of attorney fees was based on a contractual provision in Dr. Yedidag’s employment agreement with Eastern, which provided that “[i]n the event that either party resorts to legal action to enforce the terms and provisions of this [ajgreement, the prevailing party shall be entitled to recover the costs of such action so incurred, including, without limitation, reasonable attorney[] fees and applicable court costs.” {39} On appeal, Eastern contends that the award of attorney fees based on this provision was erroneous because the jury found that Eastern breached an implied promise in the employment agreement, which Eastern argues is a legally invalid claim. Eastern reiterates its earlier argument that the implied promise contractual claim cannot legally exist because it contradicts the express written termination provisions of the employment agreement. However, we have already rejected Eastern’s argument that the implied promise claim was legally invalid. See Opinion at ¶ 24. Since Eastern offers no additional rationale as to why the award of attorney fees was improper, we have no other basis upon which to consider this argument further. We therefore affirm the award of attorney fees. CONCLUSION {40} We hold that a member of a review organization can bring a private cause of action arising from an alleged violation of Section 41-9-5 of the ROIA. We affirm the jury verdict. {41} IT IS SO ORDERED, LINDA M. VANZI, Judge I CONCUR: M. MONICA ZAMORA, Judge JONATHAN B. SUTIN, Judge (dissenting) Eastern’s briefing refers to the factors identified in National Trust as the same as those for a cause of action based on negligence per se. At oral argument before this Court, Eastern again reiterated that the analysis is the same for a private cause of action arising for a statutory violation in the absence of an explicit statutory directive and a cause of action based on negligence per se. We disagree. Our Supreme Court has stated that “[n]egligence per se ... is a method of proving negligence where a cause of action already exists.” Garcia v. Rodey, Dickason, Sloan, Akin & Robb, P.A., 106 N.M. 757, 763, 750 P.2d 118, 124 (1988). Moreover, our Supreme Court has enunciated a four-part test for determining whether a negligence per se instruction is appropriate in a given case: “(1) There must be a statute which prescribes certain actions or defines a standard of conduct, either explicitly or implicitly, (2) the defendant must violate the statute, (3) the plaintiff must be in the class of persons sought to be protected by the statute, and (4) the harm or injury to the plaintiff must generally be of the type the [Ljogislaturc through the statute sought to prevent.” Heath v. La Mariana Apartments, 2008-NMSC-017, ¶ 7, 143 N.M. 657, 180 P.3d 664 (alteration, internal quotation marks, and citation omitted). Eastern made no arguments to this Court on appeal based on this four-part test and instead focused on the three non-exclusive factors set forth in National Trust. Wc observe that Jury Instruction No. 7 was an instruction based on negligence per se that was submitted to the jury in this case. This instruction was submitted in addition to Jury Instruction No. 4, which directed the jury to consider whether Eastern had violated Section 41-9-5 and defined Dr. Yedidag’s burden of proof in establishing this direct violation. However, as a result of our holding that a private cause of action can arise for violation of Section 41-9-5, we need not address the interplay between these two instructions and the relatively limited argument based on negligence per se that was presented by the parties on appeal. We clarify that these protections do not flow to the physician who is the target of the peer review action. Furthermore, although this issue is not before the Court in this case and we therefore do not decide it, we observe that an overwhelming majority of cases from other jurisdictions that have addressed the issue have held that the physician under review cannot bring a private cause of action against professional review bodies. See Scott M. Smith, Construction and Application of Health Care Quality Improvement Act of 1986, 121 A.L.R. Fed. 255, § 9 (1994) (citing to federal oases that have held that the Health Care Quality Improvement Act (HCQIA) does not create a right of action for a physician subject to the peer review process); see also Hancock v. Blue Cross-Blue Shield of Kan., Inc., 21 F.3d 373, 374 (10th Cir. 1994) (holding that the HCQIA does not create a right of action for aphysician subject to the peer review process); Tunca v. Painter, 980 N.E.2d 1132, 1137 (Ill. App. Ct. 2012) (holding that the state’s peer review statute did not give a peer reviewed physician a private right of action). Although the criminal penalty is a compelling signal of legislative intent, other provisions of the ROIA signal that the Legislature did not implicitly intend to foreclose the possibility of private remedies for other types of ROIA violations. Because the immunity provided under the ROIA is qualified in nature, a number of ROIA provisions contemplate legal action that is noncriminal in nature, thereby serving as one signal that the Legislature intended to allow for other remedies. See § 41-9-4 (stating that members of peer review organizations who perform their duties with malice toward the scrutinized physician can be held liable for “damages or other relief in any action brought by [the scrutinized physician]”); see also § 41-9-3 (providing that individuals who knowingly provide false information to a review organization “shall be subject to any action for damages or other relief’).